[No. 35162. *En Banc.* October 6, 1960.]

THE STATE OF WASHINGTON, *Respondent,* v. CHARLES E. BAKER, *Appellant.*[1]

[1]Reported in 355 P. (2d) 806.

Jacobs & Peters (*Frank August Peters,* of counsel), for appellant.

*John G. McCutcheon, Spirro Damis,* and *Schuyler J. Witt,* for respondent.

DONWORTH, J.—Appellant was charged by information with the crime of negligent homicide under RCW 46.56.040. The charging portion of the information reads as follows:

"That the said CHARLES E. BAKER in the County of Pierce, in the State of Washington, on or about the 13th day of September, Nineteen Hundred and Fifty-eight did then and there being unlawfully and feloniously operate a motor vehicle in a reckless manner with disregard for the safety of others, and while under the influence of or affected by the use of intoxicating liquor, and while so operating said vehicle and being in physical control thereof, did, as a result of such negligent operation strike and injure Ernest E. Eichhorn, a human being, from which said injuries the said Ernest E. Eichhorn, did on the 16th day of September, 1958, die, contrary to the form of the statute in such cases made and provided, and against the peace and dignity of the State of Washington."

The facts giving rise to the above charge may be briefly summarized as follows:

On Saturday evening, September 13, 1958, the opening night of the Western Washington Fair in Puyallup, Washington, Ernest E. Eichhorn, an officer of the Washington state patrol, was directing traffic at the intersection of Seventh avenue southeast and Meridian avenue, which is located approximately one block north of the fair grounds. The intersection was lighted by a single mercury vapor light, and officer Eichhorn was wearing a light blue state patrol jacket with white threading in the material, which would reflect light.

Appellant was driving his automobile south along Meridian avenue on his way to the fair grounds to pick

up his wife who was employed at the fair. As he approached the intersection, officer Eichhorn had just stopped the east-west traffic, and the north-south traffic had commenced to move. There is a conflict in the evidence as to the precise manner in which the accident occurred. However, as appellant passed through the intersection, his car struck officer Eichhorn, whose body was flung through the air. It came to rest in front of a Ford automobile which was traveling north on Meridian avenue and stopped with its front wheel touching officer Eichhorn's body. Although it had been raining shortly prior to the accident, the evidence was conflicting as to whether or not it was raining at the time of the accident. The accident occurred a few minutes before eleven o'clock p.m.

Appellant admitted that he had consumed one stubby and four eight-ounce glasses of beer between six o'clock p.m. and the time of the accident. He denied that he was then under the influence of, or affected by, intoxicating liquor.

Shortly after the accident, appellant was taken in a patrol car by officer Alfred F. Stewart of the state patrol to the police station of the neighboring city of Sumner, Washington. Officer Richard E. Mefferd of the Sumner police department put appellant through various physical observation tests for intoxication, and also administered a breathalyzer test, which appellant took of his own volition.

Neither officer Stewart nor officer Mefferd was able to form an opinion as to appellant's sobriety from their physical observations of him. However, the result of the breathalyzer test indicated that appellant had .185 per cent alcohol by weight in his blood (185 milligrams in 100 cc. of blood).

Appellant entered a plea of not guilty. The case was tried to the court sitting with a jury. At the close of the state's case, appellant moved to dismiss the case on the ground that the state had failed to produce sufficient legally admissible evidence to support a conviction. The motion was denied. Appellant renewed his motion at the close of all the evidence and it was again denied. The case was then submitted to the jury, which returned a verdict of guilty.

Appellant's motion in arrest of judgment or, in the alternative, for a new trial was denied, and judgment and sentence was entered upon the verdict. This appeal followed.

The case, in so far as it relates to the breathalyzer test, is one of first impression in this state. Since the few cases that have been cited to us from other jurisdictions pertaining to breath-testing devices do not cover the precise issues that have been raised here, we make no reference to them.

There are twenty-one assignments of error, nine of which relate to the admissibility in evidence of the breathalyzer test result. We shall first consider these nine assignments. In order to understand the problems presented thereby, it is necessary to describe in some detail the nature of the breathalyzer and its method of operation as shown by the state's evidence.

The breathalyzer is a machine designed to measure the amount of alcohol in the alveolar breath and is based upon the principle that the ratio between the amount of alcohol in the blood and the amount in the alveolar breath from the lungs is a constant 2100 to 1. In other words, the machine analyzes a sample of breath to determine the alcoholic content of the blood. At the time of the trial of this case, there were twenty-three such machines in operation in the state of Washington.

To operate the machine, the subject blows into the machine through a mouthpiece until he has emptied his lungs in one breath. The machine is so designed that it traps only the last $52\frac{1}{2}$ cubic centimeters of air that has been blown into it. This air is then forced, by weight of a piston, through a test ampoule containing a solution of sulphuric acid and potassium dichromate. This test solution has a yellow hue to it. As the breath sample bubbles through the test solution, the sulphuric acid extracts the alcohol, if any, therefrom, and the potassium dichromate then changes the alcohol to acetic acid, thereby causing the solution to lose some of its original yellow color. The greater the alcoholic content of the breath sample, the greater will be the loss in color of the test solution. By causing a light to pass through the test ampoule and through a standard ampoule contain-

ing the same chemical solution as the test ampoule ·(but through which no breath sample has passed), the amount of the change in color can be measured by photo-electric cells which are connected to a galvanometer. By balancing the galvanometer, a reading can be obtained from a gauge which has been calibrated in terms of percentage of alcohol in the blood.

It should be made clear at the outset that appellant does not contend that results of breathalyzer tests, in general, are not admissible in evidence. He does contend that four basic requirements must be shown by the state before the results of such tests may be admitted in evidence, to wit: (1) That the machine was properly checked and in proper working order at the time of conducting the test; (2) that the chemicals employed were of the correct kind and compounded in the proper proportions; (3) that the subject had nothing in his mouth at the time of the test and that he had taken no food or drink within fifteen minutes prior to taking the test; (4) that the test be given by a qualified operator and in the proper manner.

■ The expert testimony introduced by the state in this case pertaining to the breathalyzer and its operation shows that unless the above four requirements are satisfied, the result of the test is wholly unreliable. We therefore hold that before the result of a breathalyzer test can be admitted into evidence, the state must produce *prima facie* evidence that each of the four requirements listed above have been complied with.

Appellant takes the position that the first three requirements were not met in the instant case. As to the first requirement, it is contended that the machine was not properly checked, in that Lt. DeWitt Whitman of the Washington state patrol did not use a *test* thermometer to check the temperature of the breath chamber of the machine during his periodic maintenance checks. Along this same line, it is further contended that Lt. Whitman failed to properly test the machine because he did not use a *test* thermometer to check the temperature of the test ampoule.

■ Neither contention has any merit. The breath chamber is heated to a temperature between forty-five to fifty degrees centigrade to prevent condensation. If condensation is present in the breath chamber, there is a danger that the piston which compresses the air through the test ampoule will stick and not operate properly. The test ampoule is heated to about sixty-five degrees centigrade so that it can rapidly oxidize the alcohol in the breath sample.

Lt. Whitman testified that he was in charge of the chemical testing program for the state patrol, and that he had studied and worked in that field since 1944. He said that the breathalyzer came into existence in 1955, and that he has been familiar with its operation since that time. He performed maintenance checks on the machine involved herein on July 1, 1958, and on November 14, 1958, and that on both occasions he checked the chamber and ampoule heat with the thermometer which is located in the machine itself, and that the temperatures were accurately recorded in each instance.

Appellant argues that the temperature checks should have been made with a thermometer other than the one used in the machine itself, as the machine thermometer could be faulty.

Lt. Whitman testified that the machine thermometer was checked against a calibrated thermometer at the time the machine was first obtained. In the absence of any indication that the machine thermometer was defective, we think the initial check was sufficient to establish its probable accuracy.

■ The evidence also discloses that both the ampoule and the chamber heat may vary somewhat without affecting the results of the test. The chamber heat (45-50 degrees centigrade) is marked on the thermometer by a green area, and the ampoule heat (65 degrees centigrade) is designated by a red mark. Lt. Whitman testified that if the temperature of either were substantially higher or lower, the only *possible* result would be a lower reading on the alcoholic content gauge. Thus, appellant could not be prejudiced

even if the machine thermometer were inaccurate as any error in temperature would only result in his favor.

Lt. Whitman was cross-examined on the *voir dire* and, in the absence of the jury, appellant's counsel argued his objection to the witness' testifying as to whether in his opinion the machine had been properly checked and, also, argued a motion to strike all evidence as to the breathalyzer. The trial court gave careful consideration to these motions and, after stating his reasons, denied them.

■ It is next contended that the state failed to satisfy the second basic requirement for the admissibility of the breathalyzer test in that the test ampoule used in the test given appellant was never checked to insure that the chemicals therein were of the correct kind and compounded in the proper proportions.

The ampoules are sealed glass containers which are made and compounded by the same company which makes the breathalyzer machine. The ampoule cannot be tested as to chemical content without being broken, and once it is broken it can no longer be used. Thus, it was impossible to check the particular test ampoule that was used in the test on appellant. However, the state's evidence shows that the ampoules are shipped from the manufacturer in batches and each batch has a control number, which is stamped on each and every ampoule in that particular batch. Every time a new batch is received, Lt. Whitman spot checks at least six ampoules from that particular batch. During the course of his work, Lt. Whitman has tested hundreds of ampoules and has never found one which did not contain what it was certified to contain.

The fact that the *sealed* ampoules are delivered by the manufacturer of the breathalyzer machine for exclusive use in such machine plus the additional fact of regular spot checking of the ampoules is, in our opinion, sufficient *prima facie* proof that the chemicals in any one ampoule are of the proper kind and mixed to the proper proportion.

■ Appellant argues further that Lt. Whitman was not qualified to conduct spot checks to determine the chemical contents of the ampoules as he was not a chemist.

Lt. Whitman described the method of spot checking as follows:

"I run, first, a check using known alcohol samples. By using an equilibrating device, I can then check this ampoule against a known alcohol solution and find out if the answer arrived at is the proper answer. If you arrive at the proper answer, then there has to be the proper solution in this ampoule. I then use, by another method, by titration, I titrate against the potassium dichromate in this solution with a solution which will reduce the potassium dichromate."

It is not contended that the methods of testing employed by Lt. Whitman are improper. Appellant did not produce a chemist or other qualified expert witness at the trial to challenge the methods of testing used by Lt. Whitman. The qualifications which Lt. Whitman possessed, according to his testimony, are that he is in charge of the chemical testing program of the state patrol; that he took a course in chemical testing at Northwestern University Traffic Institute; that since 1944 he has received extensive training in the field of chemical testing from leading pathologists and toxicologists; and that he has done considerable independent study of his own.

Although Lt. Whitman is not a chemist, he has had sufficient experience in the field of chemical testing of the type involved in this case to warrant the trial court's allowing him to testify concerning his spot checking of the ampoules.

 Appellant contends the state failed to meet the third basic requirement in two respects, to wit, (1) Officer Mefferd failed to examine appellant's mouth for the presence of any foreign matter prior to giving him the test; and (2) the police did not have appellant under observation for fifteen minutes prior to giving him the test.

From our examination of the record, we think that this contention is well taken. The testimony of both Lt. Whitman and Dr. Charles P. Larson, the state's two experts on the operation of the breathalyzer machine, makes it clear that unless a subject's mouth is free of all alcohol the test result will be unreliable. Their testimony further establishes that the subject must be kept under observation for

at least fifteen minutes to insure that he has not taken anything alcoholic to drink during that period and to allow any alcohol present in the mouth to be absorbed by the skin.

Officer Mefferd candidly admitted that he did not examine appellant's mouth before giving him the test. There is evidence tending to show that appellant may have had an absorbent poultice and a packing impregnated with a medicine (toothache drops) containing alcohol in a cavity in his tooth at the time he took the test. Furthermore, there is evidence tending to show that appellant may have taken some cough medicine containing forty-five to forty-six per cent alcohol by volume within fifteen minutes of the test.

Appellant testified that he took a drink of cough medicine just before being brought to the Sumner police station. Officer Stewart testified that the trip to Sumner took six to ten minutes. Officer Mefferd testified that appellant was in his presence at the police station for eight to ten minutes. Thus, under the state's own evidence, appellant may have been given the test after having been under observation for only fourteen minutes. Although this is only one minute less than the required fifteen-minute minimum, the state is bound by its own evidence to the effect that the minimum period of delay must be *fifteen* minutes.

This rule is recognized by Robert L. Donigan, general counsel for the Traffic Institute of Northwestern University, in his work entitled "Chemical Tests and the Law," at page 173, where the author states:

"A breath test will only give an accurate measure of the concentration of alcohol in the circulating blood, if there has been a lapse of *at least* 15 minutes between the taking of the last drink and the taking of the breath for analysis. During this 15-minute interval, any alcoholic liquor remaining in the mouth and throat or under a dental plate will have been washed down by saliva. Thereafter, the alcohol concentration of the *breathed* air (alveolar breath) will reflect the alcohol concentration of the blood circulating through the lungs." (First italics ours.)

Both Lt. Whitman and Dr. Larson testified at some length as to the reliability and accuracy of breath-testing machines in general. In addition, Dr. Larson, a physician spe-

cializing in forensic pathology and a leading authority on the subject of breath tests, described in great detail what various percentages of alcohol by weight in the blood meant in terms of intoxication. His testimony, if believed by the jury, could leave no doubt that a reading of .185 on the breathalyzer would indicate that the subject was very intoxicated.

We have no way of knowing whether the verdict of guilty stemmed from the jury's finding that, at the time of the accident, appellant was driving in a reckless manner, or that he was then under the influence of, or affected by, intoxicating liquor, or that both of these facts were proven beyond a reasonable doubt. Since the state failed to satisfy the third requirement for the admissibility of the breathalyzer test, the admission of such test was error. In view of the evidence in this case concerning the reliability of breathalyzer tests and the significance of a .185 reading, we are further of the opinion that the error was prejudicial. Appellant is therefore entitled to a new trial.

Since the case must be remanded for a new trial, we think that it is proper to consider certain other questions raised by appellant which are likely to arise again at the new trial.

Assignments of error Nos. 12, 13, 14, and 19 present issues concerning the nature and extent of the questions that may be asked of and answered by character witnesses.

It is urged that the trial court erred in preventing the character witnesses called by appellant from testifying concerning appellant's reputation for being a good and careful driver.

Appellant called five character witnesses. The trial court permitted one of the witnesses to testify as to appellant's reputation as a good and careful driver, but refused to permit the remaining four witnesses to so testify. This was not error. The state did not attack appellant's reputation as a good and careful driver. Therefore, to permit the other four witnesses to reiterate that which had already been testified to by the one witness would be merely repe-

titious and cumulative. The trial court, in its discretion, properly limited such testimony to a single witness.

█ The trial court allowed appellant's character witnesses to testify as to his excellent reputation for sobriety and temperance. However, the trial court refused to let the witnesses answer the following question:

" 'Knowing the reputation of the defendant for temperance, moderation and sobriety, would you think it likely that the defendant was under the influence of liquor at the time of the accident?' "

Appellant claims his witnesses should have been permitted to answer this question and cites *State v. Hooker,* 99 Wash. 661, 170 Pac. 374 (1918), in support of his position.

The *Hooker* case, *supra,* is no authority for appellant's contention here. In that case, the appellant, who had been charged with the crime of larceny, testified in his own defense. Certain impeaching witnesses testified that they knew his reputation for truth and veracity, and that it was bad. The trial court then permitted the impeaching witnesses to testify, in substance, that, from their knowledge of his reputation, they would not believe him under oath. It was held that this was not error.

The question approved of in the *Hooker* case, *supra,* related solely to the qualities of truth and veracity, and was designed to impeach or support the credibility of a defendant who testified as a witness in his own behalf. The question involved in the instant case goes much further than a question designed to impeach or support such a witness' credibility. The question here literally asks the character witness to express an opinion as to whether or not appellant is guilty of the very crime with which he is charged. Obviously, this question was solely within the province of the jury and was not the proper subject of either lay or expert opinion.

█ Appellant claims the trial court erred in refusing to instruct the jury that appellant's good character and his reputation for sobriety was competent evidence for them to consider in determining whether or not he was guilty of the crime charged.

As respondent points out, the evidence introduced by appellant related only to reputation and not to "good character." As stated in *State v. Refsnes,* 14 Wn. (2d) 569, 128 P. (2d) 773 (1942):

" . . . There is a difference between character and reputation. Character is what a man is; that is, the qualities which constitute the individual. Reputation is what people say of him. . . ."

Thus, that portion of appellant's requested instruction relating to his good character is erroneous because there was no evidence in the case to support it. It is not error to refuse to give a requested instruction unless it is correct in its entirety. *State v. Refsnes, supra.*

██ Appellant claims that the trial court erred in refusing to allow him to inquire of officer Riley Bryant, on cross-examination, whether or not he was aware of any witness whose name was not endorsed on the list of witnesses which were to be called by the state.

As the trial court noted in its ruling, officer Bryant was not appearing as a representative of the state, but only as a witness. Furthermore, he had previously testified that he had not contacted any of the witnesses. It would, therefore, appear that he had no personal knowledge as to the number or names of the witnesses. In any event, the trial court's ruling was proper.

Appellant also points out that the driver of the Ford automobile, in front of whose car decedent's body was thrown by the impact, was never called as a witness nor was his absence as such explained in any way by the state. Because of this fact, appellant contends that he was entitled to an instruction to the effect that where the state fails, without explanation, to call a witness who could testify to material facts, then the jury can assume that such witness would have testified adversely to the state.

██ The inference that witnesses available to a party and not called would have testified adversely to such party arises only where, under all the circumstances of the case, such unexplained failure to call the witnesses creates a suspicion that there has been a willful attempt to withhold

competent testimony. *Wright v. Safeway Stores, Inc.,* 7 Wn. (2d) 341, 109 P. (2d) 542 (1941), 135 A. L. R. 1367. Appellant has made no showing or contention that the testimony of any witness was being willfully withheld who could testify as to any material facts.

By way of assignments of error Nos. 15, 16, and 17, it is contended that the trial court erred in refusing to give appellant's requested instructions relating to his theory of unavoidable accident and the corollary that the negligence of appellant was not the proximate cause of the accident.

Appellant's theory of the case was that there was no misconduct on his part or, if there were any misconduct on his part, then such was not the proximate cause of the accident. The trial court's instructions Nos. 7, 8, 9, 10, and 12 adequately covered appellant's theory of the case. Instruction No. 7 points out that every element of the state's case must be proved beyond a reasonable doubt. No. 8 instructs that one of the elements of the state's case which must be proved is that the death of officer Eichhorn must have been a proximate result of appellant's operation of the automobile. No. 9 cautions that it is not enough for the state to prove drunkenness or recklessness on appellant's part without also proving that such was the proximate cause of the accident. No. 10 then defines proximate cause for the jury. No. 12 defines recklessness for the jury. These five instructions necessarily include appellant's theory of the case. The jury could not find him guilty unless there was misconduct (drunkenness or recklessness) on his part as defined by the trial court and, further, that such misconduct was the proximate cause of the accident.

Under assignments of error Nos. 11 and 21, appellant argues that without the breathalyzer test there was insufficient evidence to find that he was under the influence of, or affected by, intoxicants and, further, that there was insufficient evidence to find that he was driving in a reckless manner.

We do not agree as to either argument. Excluding the evidence of the breathalyzer test, there was still the

admission of appellant that he had consumed one stubby and four eight-ounce glasses of beer on the evening in question between the hours of six and eleven p. m. In addition, there was the testimony of officer Bryant, who arrived at the scene a few minutes after the accident, that he was of the opinion that appellant was then under the influence of alcohol. This evidence is sufficient to present to the jury the question of appellant's intoxication.

 With respect to appellant's driving in a reckless manner, the state's evidence in the case tended to show that appellant drove through the intersection at a speed of thirty to thirty-five miles an hour during very crowded vehicular and pedestrian traffic conditions and that his car swerved across the center line of the highway and struck officer Eichhorn with fatal results. We think this evidence is clearly sufficient, if believed by the jury, to support a finding of driving in a reckless manner.

Because of the trial court's error in admitting in evidence the result of the breathalyzer test, the judgment and sentence is reversed, and the case is remanded with directions to grant appellant a new trial.

WEAVER, C. J., FINLEY, ROSELLINI, OTT, FOSTER, and HUNTER, JJ., concur.

MALLERY and HILL, JJ., dissent.