**STATE of North Dakota,**
**Plaintiff-Appellee,**

v.

**Gerald A. GHYLIN, Defendant-Appellant.**

**Cr. No. 567.**

Supreme Court of North Dakota.

Dec. 27, 1976.

Daniel J. Chapman, Bismarck, for defendant-appellant.

John M. Olson, State's Atty., Bismarck, for plaintiff-appellee.

PAULSON, Judge.

Gerald A. Ghylin was convicted of the crime of driving while under the influence of intoxicating liquor by the Burleigh County Court with Increased Jurisdiction on April 30, 1976, and he appeals.

One issue is raised on this appeal: Did the trial court err in admitting into evidence the results of the Breathalyzer test given to Ghylin?

Shortly after midnight on March 5, 1976, on Highway No. 10, east of Bismarck, Ghylin was arrested on the charge of driving while under the influence of intoxicating liquor by Burleigh County Deputy Sheriff James Inman. Deputy Inman testified that he made the arrest after both having observed Ghylin's driving pattern and his motor skills, and after having formed the opinion that Ghylin was under the influence of intoxicating liquor.

Deputy Inman, while traveling east in his patrol car on Highway No. 10, a two-lane highway, first observed Ghylin's westbound vehicle as it swerved onto the north shoulder of the highway and back into the westbound lane, then into the eastbound lane, and finally back into the westbound lane of the highway. Deputy Inman immediately turned his patrol car around in order to pursue the Ghylin vehicle. Deputy Inman, before stopping the Ghylin vehicle, clocked the Ghylin vehicle at about seventy miles per hour and observed the Ghylin vehicle cross the center line several times, causing the westbound Ghylin vehicle to travel from three to four feet over the center line of the highway into the eastbound lane. After Deputy Inman turned on the patrol car's red light, the Ghylin vehicle pulled to the side of the highway while still moving quite rapidly—giving Deputy Inman the impres-

sion that the Ghylin vehicle nearly went out of control before being brought to a complete stop.

After the Ghylin vehicle was stopped, Deputy Inman approached it and asked Ghylin for his driver's license. Ghylin had difficulty locating his driver's license in his wallet. Because of Ghylin's swerving pattern of driving and his actions while he attempted to locate his license, Deputy Inman believed it necessary to ask Ghylin to perform balance tests. Ghylin, when requested to do the "heel-to-toe" test (placing the heel of one foot against the big toe of the other foot while walking in a straight line), was unable to perform this test satisfactorily—he was able to complete only two steps of the test properly, after which he swayed back and forth and lost his balance. Next, when asked to perform the "finger-to-nose" test (extending both arms sidewise and then, one arm at a time, touching the nose with the index finger of each hand), he performed improperly with one arm—placing the little finger on his lips instead of the index finger on his nose. Deputy Inman testified, in addition to these tests, that he smelled the odor of alcohol on Ghylin's breath, that Ghylin's walk was unsteady, and that Ghylin's speech was slow and slightly slurred. Based upon Deputy Inman's observations of Ghylin—that is, Ghylin's performance in the balance tests and Ghylin's swerving driving pattern—

Deputy Inman formed an opinion that Ghylin was under the influence of intoxicating liquor, and placed him under arrest. Deputy Inman then took Ghylin into custody and proceeded to the Burleigh County sheriff's office so that Ghylin could be administered a Breathalyzer test.

The Breathalyzer test was conducted by Burleigh County Chief Deputy Sheriff John Richard Peck. Chief Deputy Sheriff Peck testified that he followed the approved method, as taught to him by the state toxicologist, for conducting breath tests with a Breathalyzer.[1] Chief Deputy Sheriff Peck further testified that he followed and completed the step-by-step procedure set out in the "Breathalyzer Operational Check List" (State Toxicology Laboratory Form 106, 1 Jan. 1975), and that, as he performed the appropriate procedures, he recorded: (1) the Breathalyzer machine's serial number as 0130739; (2) the Breathalyzer test ampoule control number as 735; (3) the room air alcohol content as less than 0.01%; (4) Ghylin's blood alcohol level as 0.13%; (5) the standard solution number as 162; and (6) the standard solution alcohol content as 0.11%. The admission of the results of such test into evidence is the subject of this appeal.

Ghylin testified that he had consumed only three cans of beer at a McKenzie bar over a period of two hours prior to his

1. In *State v. Baker*, 56 Wash.2d 846, 355 P.2d 806, 809 (1960), the Washington Supreme Court explained the use of a Breathalyzer in the following manner:

"The breathalyzer is a machine designed to measure the amount of alcohol in the alveolar breath and is based upon the principle that the ratio between the amount of alcohol in the blood and the amount in the alveolar breath from the lungs is a constant 2100 to 1. In other words, the machine analyzes a sample of breath to determine the alcoholic content of the blood. . . .

"To operate the machine, the subject blows into the machine through a mouthpiece until he has emptied his lungs in one breath. The machine is so designed that it traps only the last 52½ cubic centimeters of air that has been blown into it. This air is then forced, by weight of a piston, through a test ampoule containing a solution of sulphuric acid and

potassium dichromate. This test solution has a yellow hue to it. As the breath sample bubbles through the test solution, the sulphuric acid extracts the alcohol, if any, therefrom, and the potassium dichromate then changes the alcohol to acetic acid, thereby causing the solution to lose some of its original yellow color. The greater the alcoholic content of the breath sample, the greater will be the loss in color of the test solution. By causing a light to pass through the test ampoule and through a standard ampoule containing the same chemical solution as the test ampoule (but through which no breath sample has passed), the amount of the change in color can be measured by photoelectric cells which are connected to a galvanometer. By balancing the galvanometer, a reading can be obtained from a gauge which has been calibrated in terms of percentage of alcohol in the blood."

arrest by Deputy Inman; that he never crossed the center line of the highway while driving; that he had had difficulty in finding his driver's license because the temperature was thirteen degrees below zero and because his driver's license was among the large number of cards which he carried in his wallet; and that he had had trouble performing the balance tests because of the extremely cold weather, and because of the effects of injuries he had sustained both in a rodeo accident in 1942 and in the Navy in 1943.

Ghylin contends that the trial court erred in admitting the Breathalyzer test results into evidence, alleging that there was insufficient foundation laid for such test's introduction into evidence because (1) there was no showing when and in what manner the ampoules used in the Breathalyzer test were received from the manufacturer or that these ampoules were certified in any manner by the manufacturer to be suitable for the purpose for which they were used; (2) there was no showing either in what manner or in what size lots the Breathalyzer test ampoules were tested; (3) there was no showing that Breathalyzer test ampoules maintain their effectiveness for a full year—the period between the testing by the toxicologist and their use in the instant case; (4) the chain of custody of the Breathalyzer test ampoules was not established for the intervening period between their testing by the state toxicologist and their distribution to the testing officer; and (5) there was no showing that the "standard solution" used as a second test of the Breathalyzer's accuracy was what it purported to be—a solution containing the equivalent of 0.11% blood alcohol.

■ The issues raised in the instant case parallel some of the issues this court addressed in the case of *State v. Ghylin*, 222 N.W.2d 864 (N.D.1974) (involving the same defendant, but arising out of a separate incident), in which this court reversed the conviction of Ghylin because the State had failed to lay a proper foundation for the introduction of Breathalyzer test results.

In *State v. Ghylin, supra,* 222 N.W.2d at 869, this court stated:

"We further hold, as we did in *State v. Salhus, supra* [220 N.W.2d 852 (N.D. 1974)], that the foundation for the introduction in evidence of the results of the Breathalyzer test was insufficient. The statute [§ 39–20–07, N.D.C.C.] requires proof that the test is fairly administered. We believe, as we indicated in *Salhus,* that this provision requires proof at the very least that the ampules used in performing the test are what they purport to be and have been approved, by spot-checking or analysis by the State Toxicologist or other competent authority; that the machine is of a kind approved by the State Toxicologist; that the specific machine used to make the test has been, within the not-too-distant past, examined and approved by the State Toxicologist; that the 'known solution' is what it purports to be, namely, a 0.10 per cent solution of alcohol and water; and that the officer conducting the test has the necessary qualifications."

Since our opinion in Ghylin, *supra,* § 39–20–07, N.D.C.C., has been amended to provide, in pertinent part:

"*Interpretation of chemical tests.*— Upon the trial of any civil or criminal action or proceeding arising out of acts alleged to have been committed by any person while driving or in actual physical control of a motor vehicle while under the influence of intoxicating liquor, evidence of the amount of alcohol in the person's blood at the time of the act alleged as shown by a chemical analysis of his blood, breath, saliva or urine is admissible. For the purpose of this section:

.    .    .    .    .

"5. The results of such chemical analysis shall be received in evidence when it is shown that the test was fairly administered, provided that a test of a person's blood, urine, breath, or other bodily substance and the result thereof is further shown to have been performed according to the methods

and/or with devices approved by the state toxicologist and by an individual possessing a certificate of qualification to administer the test issued by the state toxicologist. The state toxicologist is authorized to approve satisfactory techniques, devices, and methods of chemical analysis and to determine the qualifications of individuals to conduct such analysis, and shall issue a certificate to all qualified operators who shall exhibit the certificate upon demand by the person requested to take the chemical test. The state toxicologist may appoint, train, certify, and supervise field inspectors of breath testing equipment and its operation, and the inspectors shall report the findings of any inspection to the state toxicologist for appropriate action. Upon approval of the methods and devices and techniques required to perform such tests and the persons qualified to administer them, the state toxicologist shall prepare and file written record of such approval with the clerk of the district court in each county within the state which shall include:

a. A quarterly register of the specific testing devices currently approved including serial number, location, and the date and results of last inspection.

b. A quarterly register of currently qualified and certified operators of said devices stating the date of certification and its expiration.

c. The operational check list and forms prescribing the methods and techniques currently approved by the state toxicologist in using such devices during the administration of the tests.

Copies of the above records certified by the clerk of the district court shall be admitted as prima facie evidence of the matters stated therein."

In the instant case, before the State offered the results of Ghylin's Breathalyzer test into evidence, the State sought to show that the test was "fairly administered" in compliance with § 39–20–07, N.D.C.C., and our decisions in *State v. Salhus*, 220 N.W.2d 852 (N.D.1974), and *State v. Ghylin, supra*, by introducing into evidence: (1) the state toxicologist's quarterly register of currently qualified and certified Breathalyzer operators, dated January 29, 1976, certified by the clerk of the Burleigh County district court, which register stated that Chief Deputy Sheriff Peck had last been certified as a Breathalyzer operator on August 9, 1974, and that his certification would expire on April 30, 1976; (2) the state toxicologist's quarterly register of approved chemical testing devices, dated March 5, 1976, certified by the clerk of the Burleigh County district court, which register showed that the Breathalyzer machine bearing serial number 0130739 was an approved chemical testing device, that it was located in Bismarck, and that it was found to be in good working order on February 24, 1976, by an inspector certified by the state toxicologist to inspect Breathalyzer machines; (3) the state toxicologist's "Approved Method to Conduct Breath Test With Breathalyzer", dated June 27, 1975, certified by the clerk of the Burleigh County district court, which established the procedure for following the "Breathalyzer Operational Check List", State Toxicology Laboratory Form 106, used in the instant case; (4) the state toxicologist's "Breathalyzer Ampoule Analytical Report" for Breathalyzer ampoule lot number 735, dated February 13, 1975, certified by the clerk of the Burleigh County district court; (5) the completed "Breathalyzer Operational Check List", State Toxicology Laboratory Form 106 used in the instant case; (6) the state toxicologist's "Standard Solution Analytical Report" for standard solution number 162, dated February 17, 1976, certified by the clerk of the Burleigh County district court, showing that such standard solution contained the equivalent of 0.11% blood alcohol and that it was approved for use as Standard Solution in breath testing; (7) Chief Deputy Sheriff Peck's Breathalyzer Operator Certificate, which was valid on March 5, 1976; and (8) that the Breathalyzer test ampoules bearing control lot number 735 in Chief Deputy

Sheriff Peck's possession were given to Peck personally by the state toxicologist in a locked and sealed metal container on February 24, 1975, and that he has had such ampoules in his sole possession since that date.

We find that the foregoing foundation, absent evidence to the contrary, adequately establishes that the Breathalyzer test administered to Ghylin in the instant case complied with the standards required by § 39–20–07, N.D.C.C., and with our decisions in *State v. Salhus, supra*, and *State v. Ghylin, supra*.

■ We find no merit in Ghylin's contention that the State should have been required to show: (1) in what manner the test ampoules used in the Breathalyzer test were received from the manufacturer; (2) whether the test ampoules were certified to in any manner by the manufacturer to be suitable for the purpose for which they were used; (3) in what manner the test ampoules were tested by the state toxicologist; (4) in what size lots the test ampoules were tested; and (5) in whose custody the test ampoules were between their testing by the state toxicologist and their distribution by him to the testing officer. Section 39–20–07(7), N.D.C.C., provides:

"7. Notwithstanding any statute or rule to the contrary, the defendant may subpoena the state toxicologist or any employee thereof to testify at the trial of the issue at no cost to the defendant."

The state toxicologist's "Breathalyzer Ampoule Analytical Report" for Breathalyzer ampoule lot number 735 dated February 13, 1975, indicating that the state toxicologist performed qualitative, quantitative, and practical tests with the Breathalyzer test ampoules to determine the suitability of ampoule lot number 735 for use in the Breath Alcohol Testing Program, was submitted in evidence. Such analytical report stated that Breathalyzer ampoule lot number 735 was suitable for use in the Breath Alcohol Testing Program. Ghylin did not subpoena the state toxicologist or any of his employees for examination at his trial, as he had a right to do pursuant to § 39–20–07(7), N.D.C.C.; nor did Ghylin submit any evidence which would dispute the presumption that the state toxicologist properly performed his official duties in obtaining, testing, and distributing the Breathalyzer ampoules in the instant case. § 31–11–03(15), N.D.C.C.

■ We also find no merit in Ghylin's contention that the State should have been required to show that the Breathalyzer test ampoules maintained their effectiveness for a full year—the period between the testing by the state toxicologist (February 13, 1975) and their use in the instant case (March 5, 1976). Again we note Ghylin's failure to exercise his right under § 39–20–07(7), N.D. C.C., to subpoena the state toxicologist for examination, and Ghylin's failure to submit any evidence that would create a reasonable doubt of the effectiveness of the ampoules in lot number 735 on March 5, 1976. We further note that such ampoules are sealed glass containers which must be broken before one may reach their contents; that Chief Deputy Sheriff Peck testified that the test ampoule used in Ghylin's breath test was at all times in Chief Deputy Sheriff Peck's exclusive possession in a locked box from the time that he received such ampoules from the state toxicologist; and that the test ampoule used in the instant case successfully passed two accuracy tests which are routinely performed at the time of the administration of a Breathalyzer test —first, to test the alcohol content of room air, and, second, to test the alcohol content of a "standard solution". In the absence of the creation of a reasonable doubt that the Breathalyzer test ampoule used in the instant case had lost its effectiveness, the State need submit nothing more to prove that such ampoule is what it purports to be than to establish that the lot containing such ampoule had been analyzed by the state toxicologist and found to be suitable for use in the Breath Alcohol Testing Program—which was done in the instant case through the introduction into evidence of the state toxicologist's "Breathalyzer Am-

poule Analytical Report" for Breathalyzer ampoule lot number 735. *See City of Monroe v. Robinson*, La., 316 So.2d 119 (1975); *State v. De Vito*, 125 N.J.Super. 478, 311 A.2d 753 (1973).

Finally, we find no merit in Ghylin's contention that the Breathalyzer test results should not have been admitted into evidence because the State failed to show that the standard solution used to test the accuracy of the Breathalyzer was what it purported to be—the equivalent of 0.11% blood alcohol. Ghylin contends that, because the State failed to prove a chain of custody of the standard solution between the time the state toxicologist tested the solution and the solution's use in the instant case, that such solution's integrity is uncertain—thus rendering the Breathalyzer's test results inadmissible. We disagree.

State Highway Patrolman David Hungness, a certified chemical test operator, testified that a standard solution serves two functions in the calibration of Breathalyzers. First, it is used to test the machine's accuracy on a monthly basis—each time the standard solution is changed, it is tested to see if the Breathalyzer indicates that it contains the equivalent of 0.11% blood alcohol; and, second, it is used to test the machine's accuracy every time a breath test is conducted—at the conclusion of each breath test, a test is run on an air sample blown through the standard solution to make sure that the Breathalyzer indicates that it contains the equivalent of 0.11% blood alcohol (during the course of a month, such reading may be lower as the alcohol content evaporates).

In the instant case, the State submitted into evidence the state toxicologist's "Standard Solution Analytical Report" for standard solution number 162. Such report indicated that standard solution number 162 contained an equivalent of 0.11% blood alcohol and that it was approved for use as a standard solution in breath tests. Patrolman Hungness testified that he was responsible for changing the standard solution on a monthly basis for the Breathalyzer used in the instant case. Patrolman Hungness further testified that he had received standard solution number 162 through the mail; that it came with a form letter from the state toxicologist which was returned to the state toxicologist; that the standard solution is packaged in a sealed plastic bottle, but that the solution is poured into a "simulator" which is not sealed or secured in the sheriff's office; that at the time he, Patrolman Hungness, inserted the standard solution number 162 into the "simulator" used in the instant case, he conducted two tests to verify the solution's blood alcohol equivalency—which tests verified that standard solution number 162 contained the equivalent of 0.11% blood alcohol. Such test results were entered in evidence.

Chief Deputy Sheriff Peck testified that the standard solution used in the instant case bore number 162. He further testified that when he tested such solution at the conclusion of the breath test administered to Ghylin, the Breathalyzer indicated that standard solution number 162 contained an equivalent of 0.11% blood alcohol.

We find the foregoing to be sufficient foundation to establish that the standard solution which was used was what it purported to be at the time of the Ghylin breath test.

For the reasons stated in the opinion, the judgment of the Burleigh County Court with Increased Jurisdiction is affirmed.

ERICKSTAD, C. J., and PEDERSON, VOGEL and SAND, JJ., concur.