[Nos. 74579-0; 74602-8;    En Banc.]
74603-6.
Argued March 23, 2004.    Decided July 1, 2004.

The City of Seattle, *Petitioner*, v. Wonda Clark-Munoz,
*Respondent*.

The City of Seattle, *Petitioner*, v. Gareth Hall,
*Respondent*.

The State of Washington, *Petitioner*, v. Ted Jagla,
*Respondent*.

*Thomas A. Carr, City Attorney*, and *Moses F. Garcia* and *Robert F. Murashige, Assistants*, for petitioner City of Seattle.

*Norm Maleng, Prosecuting Attorney*, and *Mychal H. Schwartz, Deputy*, for petitioner State of Washington.

*Christine A. Jackson* and *Erick Spencer* (of *The Public Defender*), for respondent Clark-Munoz.

*Joshua S. Schaer* (of *N.W. Defenders Association*), for respondent Hall.

*Scott R. Robbins* (of *Hughes Robbins, P.S.*) and *Howard S. Stein*, for respondent Jagla.

*Timothy J. Donaldson* on behalf of the City of Walla Walla, amicus curiae.

*Charles F. Blackman* on behalf of Washington Association of Prosecuting Attorneys, amicus curiae.

*Geoffrey L. Burg, William K. Kirk, Francisco A. Duarte*, and *Ryan B. Robertson* on behalf of Washington Foundation for Criminal Justice, amicus curiae.

CHAMBERS, J. — In its efforts to curb drunken driving, Washington State makes extensive use of breath tests of suspected intoxicated drivers. Effectively, whether a driver

is intoxicated is often decided when the test is taken. These tests must be reliable, both to further the safety of our streets and to ensure just application of our law. Today, we consider the statutory and regulatory procedures for confirming the reliability of these tests. We conclude that the State failed to comply with them. We affirm the trial courts below that the breath tests before us were not performed on properly tested machines, and remand.

## BACKGROUND

The breath test used in Washington State compares the amount of alcohol vapor in a known sample with the alcohol vapor present in a breath sample, at a known temperature. *See* WAC 448-13-035, -050, -060. Recently, the regulations governing breath tests have been amended, apparently in an attempt to provide standardized procedures that will ensure a high degree of accuracy. One regulation now reads:

> The ability of the simulator to provide a reference ethanol vapor concentration is a function of its temperature. The thermometers used in the simulators shall be certified on an annual basis to have an accuracy of within plus or minus 0.1 degree centigrade. *Such certification shall be made using a reference thermometer traceable to standards maintained by the National Institute of Standards and Testing (NIST),*[1] *or its successor.*

WAC 448-13-035 (emphasis added).

The defendants below were all arrested for traffic violations, and each submitted to a breath test. Each was charged with driving under the influence under RCW 46.61.502 or its local counterpart. In each case, counsel moved to exclude the results of the breath test on the grounds that the test machine thermometers were not properly certified under WAC 448-13-035 because they

---

[1] The parties agree that state toxicologist meant the National Institute of Standards and *Technology*, the entity established by Congress explicitly to create a single source for measurements in this country, compatible with international standards. *See* 15 U.S.C. §§ 271-72; U.S. Const. art. I, § 8.

were not tested on thermometers traceable to standards maintained by NIST.

The trial courts agreed and suppressed the tests. As Judges Rietschel and Doyle ruled:

> The language of WAC 448-13-035, "traceable to standards maintained by NIST" is clear and not ambiguous. Dr. Emery [University of Washington professor of Metrology] testified, and Dr. Logan [the State Toxicologist] agreed, that the phrase is a term of art with an accepted meaning in the scientific community. Both Dr. Emery and Dr. Logan testified that, according to NIST, for a thermometer to be calibrated according to NIST standards, there must be an unbroken chain of comparisons and each test report a range of uncertainties. . . . [The] calibrations . . . performed 1/18/02 do not state uncertainties and therefore do not meet the NIST definition of traceability.

Hall Clerk's Papers (CP) at 317.

The prosecutors sought writs of review of the suppression with the superior court. Unsatisfied with the result, the prosecutors then sought review at the Court of Appeals.[2] We consolidated and transferred review to this court.

## ANALYSIS[3]

### RCW 46.61.502 AND ADMISSIBILITY

■ The meaning of these statutes and regulations are questions of law, to be reviewed de novo. *City of Seattle v. Allison*, 148 Wn.2d 75, 81, 59 P.3d 85 (2002). We apply the

---

[2] The parties do not agree how to characterize the superior court resolution of the writ issue. Since we decide this case on its merits, we do not reach this issue. Jagla's motion to strike is denied.

[3] The parties dispute whether the superior courts had the authority, under the writ statute and procedural rules, to entertain these cases. We elect to resolve this case on the merits and do not reach whether the superior court should have entertained the writs. We also decline to address whether the trial courts erred in excluding the breath tests on the alternate grounds of expense, delay, and undue prejudice. On the record before us, we do not reach whether a breath test machine may be retroactively certified.

standard rules of statutory construction to state toxicology regulations, reading the regulations in the context of the larger statutory and administrative system, and avoiding strained interpretations or absurd results. *Id.*

■ A trial judge's ruling on the admissibility of evidence is reviewed for abuse of discretion. However, when a trial court ruling is based on a mistaken interpretation of law, this court may vacate the decision or remand to the trial court for reconsideration under the correct standard. *See id.* at 86.

A violation of RCW 46.61.502 may be proved in two different ways: either by showing the defendant's blood alcohol level was at least 0.08 within two hours after the incident (sometimes called "per se") or by other evidence, typically testimony, tending to show that the defendant was under the influence of alcohol and/or other drugs (sometimes called "other evidence"). RCW 46.61.502; 13A SETH A. FINE & DOUGLAS J. ENDE, WASHINGTON PRACTICE: CRIMINAL LAW § 804, at 148 (2d ed. 1998). We turn first to whether these tests are admissible as per se evidence.

### 1. TRACEABILITY

■ These test results are admissible as per se evidence of intoxication only if they meet the explicit requirements of chapter 46.61 RCW. "Analysis of the person's blood or breath to be considered valid under the provisions of this section or RCW 46.61.502 or 46.61.504 *shall* have been performed according to methods approved by the state toxicologist." RCW 46.61.506(3) (emphasis added); *see also State v. Baker*, 56 Wn.2d 846, 355 P.2d 806 (1960). The State has the initial burden of establishing foundation. To do that:

> the prosecution must show that (1) *the machine was properly checked and in proper working order at the time of the test*, (2) the chemicals used were of the correct kind and proportion, (3) the subject had nothing in his mouth at the time of the test, and

(4) the test was given by a qualified operator and in the proper manner. . . . *Compliance with approved breath test procedures is a condition precedent to admission of the test results.*

*Allison*, 148 Wn.2d at 79-80 (emphasis added) (citing *Baker*, 56 Wn.2d at 852 and *State v. Straka*, 116 Wn.2d 859, 875, 810 P.2d 888 (1991)). The question before us is whether these machines have been "properly checked." This hinges on the meaning of the term "traceable." If "traceable" is given the scientific meaning articulated by NIST, which requires that uncertainties be noted at each level of removal so that the ultimate uncertainty is known, then the testing machines have not been properly checked. If traceable is given a nonscientific meaning, they may comply.

■■ The state toxicologist did not define "traceable" in the regulations. The NIST policy on traceability outlines the procedures required for traceability:

> To achieve traceability of measurement results to standards maintained by NIST, you need to reference your measurement results through an unbroken chain of comparisons, *including the uncertainties at each step*, to NIST standards as the stated references. . . . The chain of comparisons may be short, if the user has instruments or artifacts calibrated by NIST or . . . [i]t may be longer, if the user references other comparisons in a chain of comparisons back to stated references developed and maintained by NIST.

Jagla CP at 347 (NIST, Supplementary Materials, *available at* http://ts.nist.gov/traceability/suppl_matls_for_nist_policy_rev.htm#FAQ_MRA2 (last visited June 23, 2004)) (emphasis added). We will give weight to the technical definition of a technical term promulgated by an expert agency. *See, e.g., City of Spokane ex rel. Wastewater Mgmt. Dep't v. Dep't of Revenue*, 145 Wn.2d 445, 454, 38 P.3d 1010 (2002). A regulation need not be ambiguous for us to consider technical definitions. *Id.* at 452.

In addition to having a policy on "traceability," NIST:

> Adopts for its own use and recommends for use by others the definition of traceability provided in the most recent version of

the *International Vocabulary of Basic and General Terms in Metrology*: "property of the result of a measurement or the value of a standard whereby it can be related to stated references, usually national or international standards, through an unbroken chain of comparisons *all having stated uncertainties*."

NIST POLICY ON TRACEABILITY, available at http://ts.nist.gov/ traceability/nist%20traceability%20policy-external.htm (last modified Dec. 3, 2001) (quoting INTERNATIONAL VOCABULARY OF BASIC AND GENERAL TERMS IN METROLOGY, Definition 6.10, BIPM, IEC, IFCC, ISO, IUPAC, IUPAP, OIML, (2d ed., 1993)) (last emphasis added). This is substantially the definition given by Dr. Ashley Emery, Ph.D, a University of Washington professor and expert witness in the science of metrology (the study of measurements). He testified that the term "traceable" in science had "an internationally agreed upon scientific meaning" that included a requirement that the uncertainties at each step be measured. Jagla CP at 51-53, 58. He testified that the requirement that uncertainties be measured and recorded is a critical element of the NIST definition. Further, Dr. Emery testified that "[w]ithout a statement of uncertainty, the measurement is worthless," and that every scientist would define "traceable" in these technical terms. *Id.* at 91-93, 72.[4]

The state toxicologist was unaware of the NIST's technical scientific definition when the regulation before us was promulgated. He testified that he did not intend to incorporate it into the breath test regulations. *See* Jagla CP at 221, 201-02. However, while the state toxicologist may not have known the precise definition, he did know it was a term of art:

The concept of traceability to a reference standard is a common principle in measurement science. It describes the notion that

---

[4] Dr. Emery also testified that additional steps should be taken when calibrating a thermometer to ensure that the thermometer is giving a correct reading, including measurements at different temperatures, use of a microscope in recording the readings, ambient temperature, and relative humidity. The parties do not argue that this has been incorporated into the meaning of "traceable." Jagla CP at 93, 98-99.

there is an absolute standard for temperature, maintained by the National Institute for Standards and [Technology] (NIST), and that the reference thermometer used to certify the mercury in glass thermometers used in this program, must be compared against a thermometer which has been checked either directly or indirectly[5] against that absolute standard, and thus can be "traced" to it.

State Toxicologist, Wash. St. Reg. 01-17-009 (Aug. 2, 2001). All this weighs in favor of our conclusion that "traceable" is a technical term, to be given its technical meaning.

As Judges Chapman, Eiler, and Jacke found in their well reasoned opinion:

In order to accept the State's position in this matter, we must find that Dr. Logan, while citing to the NIST standards, did not intend to incorporate their clear meaning, and, perhaps more importantly, that Dr. Logan's subjective intent as to the meaning of the regulation controls public interpretation of the code. The State argues that the WAC should be read to require only that the reference thermometers be compared in *some manner* to the thermometer that NIST maintains. The administrative rule simply does not say that. The WAC regulation -035 requires that certification of the simulator thermometer "shall be made by using a reference thermometer traceable to *standards maintained by the National Institute of Standards and [Technology] (NIST)*." The definitions NIST has promulgated are clear and unambiguous . . . and the testimony of the witnesses in this case agrees that NIST has only one definition of "traceable to standards." The NIST requirement is clear: an unbroken chain of comparisons and each provided measurement must be accompanied by a statement of uncertainties. . . .

If the citizens of the State of Washington are to have any confidence in the breath-testing program, that program has to have some credence in the scientific community as a whole.

---

[5] The parties do not focus on the meaning of "indirect." We note that Dr. Emery testified that the "direct" method of measurement involves melting a material with a known melting point under certain conditions to confirm the calibration of the thermometer. The indirect method measures against a thermometer that has been so calibrated, at some number of removals. Jagla CP at 38.

RULING BY DISTRICT COURT PANEL (available as App. B to Jagla mot. for discretionary review). We agree.

■ We find that in order to be admissible under WAC 448-13-040, -035, and RCW 46.61.502, the thermometer in the breath test must be tested against a thermometer traceable to standards maintained by NIST. To be traceable, the uncertainties must be measured and recorded at each level. Given the posture of the cases before us, we do not reach whether substantial compliance would be sufficient. As the State has not established that the uncertainties had been measured and recorded, it has not met its foundational burden, and therefore the trial courts did not err in excluding the tests.

### 2. OTHER EVIDENCE

We now turn to whether the breath tests are admissible as "other evidence" of intoxication. We conclude that they are not.

First, like the trial courts below, we are concerned about the potential consequences of allowing breath tests that do not conform to properly promulgated reliability regulations as evidence of intoxication.

Second, we conclude that the legislature did intend that breath tests conducted *under* the statute and regulations must *comply* with the statute and regulations. *See* RCW 46.61.502(1)(a) ("A person is guilty . . . if the person drives a vehicle . . . [a]nd . . . has . . . an alcohol concentration of 0.08 or higher *as shown by analysis of the person's breath or blood made under RCW 46.61.506.*") (emphasis added). RCW 46.61.506(2) states that "[t]he foregoing provisions of this section shall not be construed as limiting the introduction of any other competent evidence bearing upon the question whether the person was under the influence of intoxicating liquor or any drug." We find it unlikely that "any other competent evidence" includes breath tests taken under the authority of that very network of statutes.

Our legislature has put specific limitations on the use of breath tests conducted pursuant to chapter 46.61 RCW and the implied consent statute, RCW 46.20.308. *See, e.g.*, RCW 46.61.506(3) ("Analysis of the person's blood or breath to be considered valid under the provisions of this section or RCW 46.61.502 or 46.61.504 *shall* have been performed according to methods approved by the state toxicologist.") (emphasis added). Not only must the tests comport with those regulations, by statute they must be performed by "an individual possessing a valid permit issued by the state toxicologist." *Id*. Washington courts have consistently upheld these standards. *E.g., Allison*, 148 Wn.2d 75; *Cannon v. Dep't of Licensing*, 147 Wn.2d 41, 58, 50 P.3d 627 (2002); *Straka*, 116 Wn.2d at 875; *Baker*, 56 Wn.2d 846; *State v. Watson*, 51 Wn. App. 947, 756 P.2d 177 (1988). Reasonably, these highly specific standards do not apply to "other evidence."

Other statutes bolster our conclusion. Unlike the "per se" section and its implementing regulations, the "other evidence" section of RCW 46.61.502 does not specifically refer to any type of blood or breath testing. We conclude the legislature was drawing a distinction between tests performed by the State and its agents, pursuant to statute, and other tests, such as tests done at the instigation of the defendant or for medical treatment. Such tests would be subject to the usual evidentiary checks. *E.g., State v. Donahue*, 105 Wn. App. 67, 69, 75-76, 18 P.3d 608 (2001) (citing *State v. Baity*, 140 Wn.2d 1, 10, 991 P.2d 1151 (2000)); *accord Louisiana v. McElroy*, 89-KK-0750 (La. 12/11/89), 553 So. 2d 456, 458 (blood test conducted to diagnose and treat condition admissible as "other evidence" of intoxication).

These questions were touched on recently by the Court of Appeals in *Donahue*. *Donahue* involved the admissibility of a blood test done on an injured driver for the purposes of medical diagnosis and treatment in an Oregon hospital following a fatal car accident in Washington. *Donahue*, 105 Wn. App. at 70. Not surprisingly, the Oregon hospital did

not use the standards set forth by the Washington State Toxicologist. The Court of Appeals determined that the test was admissible as "other evidence" of intoxication even though it did not meet the standards laid out under Washington law because it was not conducted under the authority of Washington law. *Donahue,* 105 Wn. App. at 69, 75-76. *Donahue* provides scant support for admitting nonconforming breath tests.

■ We hold that breath tests that do not meet the technical requirements of chapter 46.61 RCW and state toxicology regulations are not admissible as "any other competent evidence" of intoxication.

## CONCLUSION

This court has long required the State to abide by its own rules, especially when applied to vital privileges like driving. *E.g., Allison,* 148 Wn.2d 75; *Cannon,* 147 Wn.2d 41; *Straka,* 116 Wn.2d 859; *Baker,* 56 Wn.2d 846. In this case, the trial courts properly found that the State did not abide by its own rules, and excluded these tests. These courts are affirmed, and these cases are remanded for further proceedings consistent with this opinion.

ALEXANDER, C.J.; JOHNSON, MADSEN, SANDERS, IRELAND, OWENS, and FAIRHURST, JJ.; and THOMPSON, J. Pro Tem., concur.