521 A.2d 1281

**John E. CASPER, Sr.**

v.

**STATE of Maryland.**

**No. 943, Sept. Term, 1986.**

Court of Special Appeals of Maryland.

March 10, 1987.

---

*loquitur* instructions. *See,* however, W. Page Keeton, *Prosser and Keeton on Torts* Ch. 6 § 40 (5th ed. 1984).

578

Gerald A. Kroop and John D. Thompson (Kroop, Kurland & Rosenberg, on brief), Baltimore, for appellant.

Ann E. Singleton, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, Thomas E. Hickman, State's Atty. for Carroll County and Kathi Hill, Asst. State's Atty. for Carroll County, on brief), Westminster, for appellee.

Submitted before MOYLAN, ALPERT and BLOOM, JJ.

ALPERT, Judge.

This appeal concerns evidence that must be presented to assure the accuracy of results from a breathalyzer[1] test offered in a prosecution for drunk driving.

## Facts

Appellant, John E. Casper, Sr. (Casper), was the unfortunate recipient of a chemical breath test the night of September 13–14, 1984. His predicament began when Corporal Andrew Mays, of the Maryland State Police, responded to a call that a blue station-wagon was being driven erratically on southbound Route 91 near Finksburg. Mays located the vehicle, followed it for a short time, and signaled the driver to pull off of the road. That driver was Casper. Standard field tests supported Mays' suspicion that Casper was not completely sober.

Mays arrested Casper and transported him to the Westminster barrack. At the barrack, Sergeant James Huber, a certified breathalyzer operator, conducted a chemical breath test examination upon Casper. Results from that test indicated Casper's blood contained .21% alcohol by weight. Casper was then processed, released and driven home by his wife.

On June 24, 1986, Casper was tried by a jury (Judge H. Chester Goudy presiding) in the Circuit Court for Carroll County upon charges of driving a motor vehicle while intoxicated and failing to drive in a single lane. At that trial, the State established Sergeant Huber's qualifications to administer chemical breath examinations. Through Huber, the State then introduced a written statement, signed by Yale H. Caplan, a toxicologist with the Maryland Department of Post Mortem Examiners, certifying that the breathalyzer used to test Casper was "approved for chemical analysis to determine blood alcohol concentrations." The

---

1. Breathalyzer is the brand name of an apparatus used to determine the percentage, by weight, of alcohol in a person's blood. Like many brand names, "breathalyzer" has become a generic term used to describe a variety of blood-alcohol content testers. The specific apparatus used by police in this case was the Breathalyzer model 900, serial number 6444.

statement certified further that the (1) Breath Alcohol Simulator; (2) Certified Breathalyzer Solution; and (3) Ampule Gauge, as manufactured and supplied by the breathalyzer's maker, were approved for use in conjunction with the machine. Caplan's statement, dated May 17, 1984, expired by its terms December 14 of that year, three months after Casper's test.

Sergeant Huber was then permitted to describe the procedures used in administering Casper's breathalyzer test, which description we now paraphrase:

(1) The breathalyzer was turned on and brought to proper operating temperature;

(2) Huber placed a "test ampule" and a "standard ampule" containing sulphuric acid, potassium dichromate, silver nitrate and distilled water into holders in the breathalyzer;

(3) Huber purged the breathalyzer with an infusion of alcohol-free air and set gauges used to measure the alcohol content of air in the apparatus to "0";

(4) Casper then blew into the breathalyzer until he had emptied his lungs in a single breath;

(5) A short time later, the breathalyzer indicated and recorded Casper's blood alcohol content;[2] and

---

2. The chemical process by which this indication is achieved was described in *State v. Baker*, 56 Wash.2d 846, 355 P.2d 806, 809 (1960):

[The subject's breath is] forced, by weight of a piston, through [the] test ampoule containing a solution of sulphuric acid and potassium dichromate. This test solution has a yellow hue to it. As the breath sample bubbles through the test solution, the sulphuric acid extracts the alcohol, if any, therefrom, and the potassium dichromate then changes the alcohol to acetic acid, thereby causing the solution to lose some of its original yellow color. The greater the alcoholic content of the breath sample, the greater will be the loss in color of the test solution. By causing a light to pass through the test ampoule and through a standard ampoule containing the same chemical solution as the test ampoule (but through which no breath sample has passed), the amount of the change in color can be measured by photoelectric cells which are connected to a galvanometer. By balancing the galvanometer, a reading can be obtained

(6) Huber then conducted a "simulator check" in which he again purged the breathalyzer and tested a "simulator fluid" containing .10% alcohol by weight.

Over objections of counsel, the trial court then admitted Casper's test results into evidence.

The jury convicted Casper of driving while intoxicated.[3] Judge Goudy sentenced appellant to 30 days incarceration (suspended), placed him on 3 years probation and assessed court costs against him. Casper noted this appeal.

The specific issues presented by the appellant are these:

1. Whether the failure of the State to produce expert testimony as to the reliability of simulator fluid used to check the working condition of the breathalyzer violated appellant's constitutional right to confront the witnesses against him.

2. Whether procedures used to assure the reliability of chemical compounds used in appellant's breathalyzer examination were of such "questionable accuracy" as to preclude the admissibility of that examination.

We shall address these issues in the reverse of the order in which they were presented.

### Chemical Breath Tests

It is a violation of Maryland's Transportation Article to drive any vehicle while intoxicated. Md. Transp. Code Ann. § 21–902(a) (1984). In a prosecution for such a violation, the State may administer a chemical test of the accused's breath for the purpose of determining the alcohol content of his blood. Md.Cts. & Jud.Proc. Code Ann. § 10–302 (1986 Cum.Supp.). If results from the test indicate the driver's blood contains .13% by weight alcohol, that fact is *prima*

---

from a gauge which has been calibrated in terms of percentage of alcohol in the blood.

**3.** Casper was also convicted of failing to drive in a single lane. Judge Goudy merged that conviction into the DWI conviction.

*facie* evidence that he was driving while intoxicated. *Id.* § 10–307(e) (1984).

■ The evidentiary use of chemical tests for blood alcohol content is provided for in Courts and Judicial Proceedings Article, Sections 10–302 through 10–307 (1984). Section 10–307(a) provides that a person's blood alcohol content "shown in chemical analysis *as provided in this subtitle* is admissible in evidence...." (Emphasis added). The subtitle provides that a chemical breath test must be conducted within two hours after the driver is apprehended, § 10–303, and must be administered by a "qualified person with equipment approved by a toxicologist under the Postmortem Examiners Commission at the direction of a police officer," § 10–304(b). "Qualified person" means:

> a person who has received training in the use of the equipment in a training program approved by the toxicologist under the Postmortem Examiners Commission and who is either a police officer, a police employee, or an employee of the office of the Chief Medical Examiner.

§ 10–304(a)(3). Thus, before results from a chemical breath test are admissible, the State must establish that the test was conducted within two hours of the driver's apprehension by a "qualified person" using test equipment approved by the State toxicologist. *See* 68 Op. Att'y Gen. 446, 456–57 (1983). To establish this last point, Section 10–304(e) specifically provides:

> [f]or the purpose of establishing that the test was administered with equipment approved by the toxicologist under the Postmortem Examiners Commission, a statement signed by the toxicologist certifying that the equipment used in the test has been approved by him shall be prima facie evidence of the approval, and the statement is admissible in evidence without the necessity of the toxicologist personally appearing in court.

Those, then, are the three elements of the foundation that must be laid before chemical breath test results are admissible.

■ Test results produced by a qualified person using certified equipment in a timely manner are *prima facie* reliable. *See Moon v. State,* 300 Md. 354, 370, 478 A.2d 695 (1984). The assurance of reliability provided by this evidence is particularly important because of the dispositive nature of blood alcohol content evidence. An alcohol level of .13% or more constitutes *prima facie* proof of intoxication.[4] Md.Cts. & Jud.Proc. Code Ann. § 10–307(e) (1984). Factfinders are likely to attach great weight to the objective, scientific assessment of intoxication presented by this evidence. A cautious insistence that the State produce proof required by the statutes ensures that this weight is not misplaced.

### 1. *Ampules*

Casper argues that his unfavorable breath test results should have been excluded because "the ampules used were of questionable accuracy."[5] The premises put forth by Casper to support his challenge to the ampules' accuracy are these: the ampules were taken from a lot of 2,500 ampules of which only 25 were examined for chemical accuracy; and police received the ampules nine months before Casper's chemical breath test. Casper contends that the particular ampules used in his test should have been examined and that the State should have demonstrated that the ampules remained effective after nine months.

---

**4.** An alcohol level of .08% or more is *prima facie* proof that the defendant was driving while impaired. Md.Cts. & Jud.Proc. Code Ann. 10–307(d) (1984).

**5.** Ampules (also spelled ampoule or ampul) are sealed glass containers of a specific chemical compound made by the company that manufactures the breathalyzer apparatus. That chemical compound and the role ampules play in a chemical breath test are described in footnote 2.

Technically, Casper's challenge is to the accuracy of the chemical compound contained in the ampule rather than to the ampule itself. Nevertheless, we shall use the term "ampule" to signify the chemical compound held therein.

We must first determine whether the State has any obligation to demonstrate the chemical accuracy of ampules. If it does, we must then resolve what form that proof must take.

■ Chemical breath test results are inadmissible absent a showing that the test was administered with equipment approved by the State toxicologist. Md.Cts. & Jud.Proc. Code Ann. § 10–304(b) (1984). The term "equipment" is not defined in statutes controlling the evidentiary use of test results. Thus, we visit the first rule of statutory construction and attribute to "equipment" its ordinary and generally understood meaning. *See In re Criminal Investigation No. 1–162,* 307 Md. 674, 685, 516 A.2d 976 (1986). Webster reads equipment to mean implements used in an operation or activity.[6] Ampules play a central role in the activity of determining a defendant's blood alcohol content. *See, supra,* note 2. There can be no breathalyzer test without an ampule. Improperly constituted ampules produce inaccurate test results. *See* Watts, *Some Observations on Police Administered Tests for Intoxication,* 45 N.C.L.Rev. 34 n. 92 (1966); Note, *Defendant's Right to Independent Analysis of the Breathalyzer Ampoule: The Probable Virginia Response,* 21 Wm. & Mary L.Rev. 219, 227–228 (1979). Were the toxicologist's approval not to encompass this very central implement of a breath test, the assurance of reliability provided by that approval would be shallow indeed. We agree with the many states that include ampules among the equipment that must be certified as a condition to admissibility of breath test results. *See, e.g., State v. Ghylin,* 222 N.W.2d 864, 869 (N.D.1974); *State, City of St. Louis Park*

---

6. "[T]he physical resources serving to equip a person or thing ... the implements (as machinery or tools) used in an operation or activity." Webster's *Third New International Dictionary,* 768 (1971). The following commentary is also provided:

EQUIPMENT usu. covers everything, except personnel, needed for efficient operation or service often applying also to human qualities and skills useful in this way.

*Id.*

*v. Quinn,* 289 Minn. 184, 182 N.W.2d 843, 845 (1971); *State v. Baker,* 56 Wash.2d 846, 355 P.2d 806, 809–810 (1960). We move now to determine whether methods used in this case to assure the accuracy of Casper's ampules were sufficient.

■ In the case at bar Sergeant Huber testified that Casper's ampules were taken from lot 92 which, he indicated, contained about 1,200 ampules. The State toxicologist's certification, introduced through Huber, stated:

> The Certified Breathalyzer Solution as distributed by Smith and Wesson and certified by ... Galbraith Laboratories, Inc. is approved for use in conjunction with the above Breathalyzer.[7]

Galbraith's "Certification of Analysis," also produced and admitted into evidence, indicated that a chemical analysis conducted on 25 ampules from lot 92 produced results well within the manufacturer's tolerance range. The certificate, signed by a Galbraith representative and dated December 2, 1983, represented:

> The above report indicated that this batch of ampuls complies within established tolerances for Breathalyzer solution as specified by the manufacture, for use in all Breathalyzers.

Thus, the State toxicologist relied on Galbraith's random testing procedure in approving this equipment. Random testing of ampules is widely accepted as reliable *prima facie* proof that the chemical compound of any one ampule in a lot is the correct kind in proper proportion. *See, e.g., Ghylin, supra,* 222 N.W.2d at 869; *Baker, supra,* 355 P.2d at 811; *State v. DeVito,* 125 N.J.Super. 478, 311 A.2d 753, 754 (1973). Therefore, we hold that the State toxicologist's approval of ampules certified by an independent laboratory using random testing meets the requirements of section

---

7. Galbraith Laboratories, Inc. is an independent chemical testing company under contract with Smith and Wesson, the ampule manufacturer, to test the chemical compounds in the ampules.

10–304(b) and constitutes *prima facie* evidence that any ampule in the lot is chemically accurate.[8]

■ On the basis of this holding, we reject Casper's assertion that the age of his ampules made his test results unreliable and, therefore, inadmissible. Proof of random testing provides sufficient indicia of an ampule's chemical integrity. Coupled with the evidence that his test was performed by a qualified person in a timely manner with approved equipment, Casper's results were *prima facie* reliable. Casper was free to challenge that reliability with evidence tending to show that the ampules had changed since being certified. Md.Cts. & Jud.Proc. Code Ann. § 10–304(f) (1984). The fact that his ampules were 9 months old, without more, however, went to the weight, not to the admissibility of Casper's test results. Consequently, the State was not required to offer further proof of the chemical accuracy of these ampules. *See State v. Ghylin*, 248 N.W.2d 825, 831–832 (N.D.1976).

### 2. *Simulator Fluid*

Sergeant Huber testified that immediately after determining Casper's blood alcohol content, he ran a "simulator check" on the breathalyzer "to make sure it was operating properly." Huber explained that the check is conducted with a "known solution" of .10% alcohol. Huber indicated that he did not mix the simulator fluid. That job was performed by Sergeant Mastrino who, though available to testify, was not called by either party. On the basis of the resulting reading of ".10" Sgt. Huber concluded, "the breathalyzer instrument that I was using on [the night of appellant's arrest] was functioning properly."

---

**8.** Thus, we reject Casper's contention that the State must examine every ampule used in a chemical breath test. We note that to examine an ampule, the ampule must be destroyed. To accept Casper's contention would bring an end to chemical breath testing in short order.

Of course, if the State intends to rely on random testing, it must demonstrate that such a test was performed on the lot from which a defendant's ampules were taken.

Casper argues that Sgt. Huber's conclusion was based on the hearsay representation of Sgt. Mastrino that the simulator fluid contained .10% alcohol.[9] Relying on *Moon v. State,* 300 Md. 354, 478 A.2d 695, *cert. denied,* 469 U.S. 1207, 105 S.Ct. 1170, 84 L.Ed.2d 320 (1985), Casper contends that his constitutionally protected right of confrontation was violated when he was denied the opportunity to cross-examine Mastrino as to simulator checks and the mixing of the fluid used in his test.

Scientific and medical experts are frequently allowed to express an opinion based, in part, on objective data provided by others. *See Watts v. State,* 223 Md. 268, 271–272, 164 A.2d 334 (1960); *Swain v. State,* 50 Md.App. 29, 45–46, 435 A.2d 805 (1981). In *Fitzwater v. State,* 57 Md.App. 274, 469 A.2d 909 (1984), we held that a trial court had not abused its discretion in allowing a police officer, qualified to operate a radar machine, to testify to the accuracy of the radar's internal calibration, though he had not calibrated the machine. Nevertheless, because Casper raises important constitutional considerations, we shall discuss possible confrontation clause ramifications. *See Standifur v. State,* 64 Md.App. 570, 583, 497 A.2d 1164, *cert. granted,* 305 Md. 175, 501 A.2d 1323 (1986).

In *Moon,* after an exhaustive review of cases construing the Confrontation clauses of the Sixth Amendment of the United States Constitution [10] and the 21st Article of the

---

**9.** McCormick's widely adopted definition of hearsay, appearing in the second edition, reads:

testimony in court, or written evidence, of a statement made out of court, the statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter.

E. Cleary, *McCormick on Evidence* § 246 p. 584 (2d ed. 1972).

**10.** This clause, made binding on the states through the Due Process Clause of the Fourteenth Amendment, *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), reads, "In all criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses against him."

Maryland Declaration of Rights,[11] the Court of Appeals concluded:

> [t]hese cases make indeliby clear that the essence of the Confrontation Clause is to secure the right of the defendant to have the witness against him produced in court. An exception is noted when the witness is unavailable and has made an otherwise trustworthy out-of-court statement. In such circumstances, unavailability may be established when the State demonstrates a good-faith effort to produce the witness but to no avail.

300 Md. at 368–369, 478 A.2d 695. The court quickly added:

> [t]he cases also suggest circumstances where the courts have found no confrontation violation because the evidence to be offered is clothed with substantial indicia of reliability. Such evidence is admitted without the declarant's testimony when producing the witness would likely prove unavailing or pointless.

*Id.* at 369, 478 A.2d 695. This latter point derives in part from *Ohio v. Roberts,* 448 U.S. 56, 65, footnote 7, 100 S.Ct. 2531, 2538, footnote 7, 65 L.Ed.2d 597 (1980), about which the Court of Appeals said:

> [i]n footnote 7, the [U.S. Supreme] Court indicated when "unavailability" might not be required. Citing *Dutton v. Evans,* [400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970)], the Court suggested that if the *utility* of trial confrontation is "so remote" the prosecution would not be required to produce a seemingly available witness.

300 Md. at 368, 478 A.2d 695 (emphasis in original). The Supreme Court's "suggestion" was raised to an explicit holding in *United States v. Inadi,* 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986).

Following its constitutional analysis, the Court of Appeals held in *Moon* that a defendant's right of confrontation was denied when a trial court admitted a facially unreliable

---

**11.** Article 21's Confrontation Clause reads, "In all criminal prosecutions, every man hath a right to be confronted with the witnesses against him."

blood-alcohol test report into evidence without the testimony of the technician who performed the test. 300 Md. at 373, 478 A.2d 695. There, the technician was present in the courtroom and available to testify. Instead of calling the technician to testify, the State had a toxicologist interpret the report for the jury. Central to the court's holding was the toxicologist's inability to explain substantial indicia of unreliability appearing on the face of the report.[12] Clearly, then, there would have been obvious utility in allowing Moon to confront the man who performed his blood tests.

Applying principles articulated in *Inadi, supra,* the U.S. Court of Appeals for the Second Circuit recently held that a defendant's confrontation right was *not* violated when prosecutors failed to produce a chemist for cross-examination as to the accuracy of information he had provided to a testifying toxicologist. *Reardon v. Manson,* 806 F.2d 39 (2d Cir., 1986). In that case, the court found that the test results bore "sufficient indicia of reliability" and that there was "little potential utility" in producing the chemists for cross-examination. *Id.* at 41–43.

We are asked here to determine whether appellant's confrontation right was violated when results from a chemical breath test were admitted into evidence without testimony from the technician who mixed fluid used to check the accuracy of the instrument which produced those results.

■ Casper correctly states that the reliability of a simulator check depends upon the accuracy of the simulator fluid mixture. Casper, however, was convicted upon his test results, not upon the simulator check and the reliability of test results depend upon the accuracy of the test equipment, the qualifications of the tester, and the timeliness of

---

12. That indicia of unreliability included: a three-day lag between the dates on which the blood sample was taken and the tests were conducted; the failure of the report to indicate what type of tests were performed; the absence of Moon's name on the report; and the fact that the tests were conducted after the treatment for which they were requested.

the test. The State proved those facts below. While a simulator check offers some indication of the accuracy of a breathalyzer, the Legislature has provided that the State toxicologist's certification constitutes sufficient proof of this point. Md.Cts. & Jud.Proc. Code Ann. § 10–304(e) (1984). We hasten to add that Casper's simulator reading of ".10" bolstered the assurance of accuracy offered by the toxicologist's certificate. In short, Casper's test results bore substantial indicia of reliability.

Further, in light of testimony offered by Sgt. Huber, there was little potential for utility in producing the technician who mixed and maintained the simulator fluid. Huber fully explained simulator check procedures. He testified that the fluid was mixed twice a month and described, at length, the conditions under which the fluid was maintained at the Westminster barrack. Importantly, we note that the State toxicologist has issued detailed regulations concerning personnel and equipment with the purpose of assuring accurate chemical breath test results. *See* Regs. of the Toxicologist, Office of Chief Med. Exam'r (P.E.C.) Regarding Test of Breath and Blood for Alcohol (1983). While Sergeant Mastrino had no motive to ignore those regulations and to distort the alcoholic content of the simulator fluid, his sense of duty and desire to remain employed provided incentive to refrain from such behavior. We see little utility in requiring the State to produce every technician who touches the chemical breath test process at every prosecution across the State in which alcohol impairment is an issue.

■■■ The State is required, upon a proper request, to produce the technician who performed the chemical breath test. Md.Cts. & Jud.Proc. Code Ann. § 10–306(b) (1984). The admissibility of test results in the absence of testimony from other technicians is governed by the standards we now review. If test results contain substantial indicia of unreliability, and defendant demonstrates the utility of a non-testing technician's testimony, the results are inadmissible with-

out the additional testimony.[13] *See Moon*, 300 Md. at 373, 478 A.2d 695. If the State shows that the technician is unavailable to testify, the test results are admissible without his testimony, if shown to be "otherwise trustworthy." *Id.* at 369, 478 A.2d 695. When, however, test results bear substantial indicia of reliability and the utility of testimony from a second technician would be remote, a defendant's confrontation right is not violated when the results are admitted without the benefit of that technician's testimony. In those circumstances, a defendant's right to subpoena the non-testing technician satisfies the requirements of the Sixth Amendment. *See United States v. Inadi*, 475 U.S. 387, ——, 106 S.Ct. 1121, 1127–29, 89 L.Ed.2d 390 (1986).

Under the facts of this case, the admission of Casper's chemical breath test results without testimony from the non-testing technician did not violate Casper's confrontation right.

## *Conclusion*

Before results from a chemical breath test are admissible into evidence, the State must demonstrate that: (1) the test was administered within two hours of defendant's apprehension; (2) a qualified person administered the test; and (3) the State toxicologist approved the equipment (including ampules) used to determine defendant's blood alcohol content. Once these three points are proven, the State has demonstrated the *prima facie* reliability of the results and they may come into evidence subject to the caveats we now review.

Proof of the facts above notwithstanding, a defendant must be given an opportunity to offer competent evidence challenging the reliability of his test results. If this evidence so compromises the reliability of the results that to

---

**13.** For example, had Casper's simulator check indicated that his breathalyzer was not operating properly, and had Sgt. Huber been unable to resolve the indicia of unreliability, it would have been an abuse of discretion to admit Casper's results over a proper objection.

admit them would deprive the defendant of a fair trial or due process, the results must be excluded. Less compelling indicia of unreliability places the admissibility of chemical breath test results within the discretion of the trial judge. While much of this kind of proof goes to the weight to be given to the test results, at some point best discerned by trial courts, indicia of unreliability quickly create an issue of admissibility.

Finally, we note that upon a proper request by defendant, pursuant to § 10–306(b) of the Courts Article, chemical breath test results are inadmissible without the testimony of the testing technician. The right of a defendant to confront other technicians is reviewed *supra.*

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.