526 A.2d 647

**Victor Chandler BRICE**

v.

**STATE of Maryland.**

No. 1457, Sept. Term, 1986.

Court of Special Appeals of Maryland.

June 10, 1987.

Robert S. Rody, Rody & Rody, Baltimore, Chartered on the brief, for appellant.

Ann E. Singleton, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Logan C. Widdowson, State's Atty. for Somerset County, Princess Anne, on the brief), for appellee.

Argued before MOYLAN and WEANT, JJ., and JAMES S. GETTY, Associate Judge of the Court of Special Appeals (retired), Specially Assigned.

MOYLAN, Judge.

This appeal by Victor Chandler Brice, a convicted drunken driver, betrays a naive failure on his part to appreciate that the very laws he invokes were designed deliberately to facilitate his conviction, not to shield him from what is virtually an unrelenting search for truth in drunken driving cases. In coping with the social problem of the drunken driver, the judicial mood and the legislative mood are in total accord. From the vantage point of applying federal constitutional law to state criminal convictions for drunken driving, the Supreme Court set the prevailing tone in *South Dakota v. Neville,* 459 U.S. 553, 558, 103 S.Ct. 916, 920, 74 L.Ed.2d 748, 755 (1983).

"The situation underlying this case—that of the drunk driver—occurs with tragic frequency on our Nation's highways. The carnage caused by drunk drivers is well documented and needs no detailed recitation here. This Court, although not having the daily contact with the problem that the state courts have, has repeatedly lamented the tragedy. *See Breithaupt v. Abram,* 352 U.S. 432, 439, 77 S.Ct. 408, 412, 1 L.Ed.2d 448 (1957) ('The increasing slaughter on our highways, most of which

should be avoidable, now reaches the astounding figures only heard of on the battlefield'); *Tate v. Short,* 401 U.S. 395, 401, 91 S.Ct. 668, 672, 28 L.Ed.2d 130 (1971) (Blackmun, J., concurring) (deploring 'traffic irresponsibility and the frightful carnage it spews upon our highways'); *Perez v. Campbell,* 402 U.S. 637, 657, 672, 91 S.Ct. 1704, 1715, 1722, 29 L.Ed.2d 233 (1971) (Blackmun, J., concurring) ('The slaughter on the highways of this Nation exceeds the death toll of all our wars'); *Mackey v. Montrym,* 443 U.S. 1, 17–19, 99 S.Ct. 2612, 2620–2621, 61 L.Ed.2d 321 (1979) (recognizing the 'compelling interest in highway safety')."

The attitude of the Court of Appeals echoes that of the Supreme Court. In *Little v. State,* 300 Md. 485, 504, 479 A.2d 903 (1984), Chief Judge Murphy expressed the controlling concern:

"Clearly the State has a compelling interest in controlling drunk driving. Indeed, as the record discloses, about sixty percent of the drivers killed in automobile accidents have elevated levels of alcohol in their blood; nationally, fifty-five percent of all traffic fatalities are alcohol related. The magnitude of the problem created by intoxicated motorists cannot be exaggerated."

The legislative response has been swift and sure. As Judge Cole pointed out for the Court of Appeals in *Willis v. State,* 302 Md. 363, 369–370, 488 A.2d 171 (1985):

"The General Assembly ... has attempted to meet the considerable challenge created by this problem by enacting a series of measures to rid our highways of the drunk driver menace. These measures, some of which are decades old, are primarily designed to enhance the ability of prosecutors to deal effectively with the drunk driver problem."

The "series of measures" referred to include prominently the laws dealing with the admissibility of chemical tests for intoxication, now codified in Md.Cts. & Jud.Proc.Code Ann. §§ 10–302 through 10–309, as well as a closely cognate provision dealing with implied consent to such a test, Md.

Transp.Code Ann. § 16–205.1. It was with specific reference to §§ 10–302 through 10–309 of the Courts and Judicial Proceedings Article that Judge Cole spoke when he described the measures as "primarily designed to enhance the ability of prosecutors to deal effectively with the drunken driver problem" and as having the deliberate purpose "to rid our highways of the drunk driving menace."

■ Since all four appellate contentions go to the application of these laws to the appellant in this case, it is fitting to begin by recognizing the appropriate guidelines for statutory construction. In *State v. Moon,* 291 Md. 463, 477, 436 A.2d 420 (1981), the Court of Appeals, through Judge Smith, expressly repudiated any notion that the laws here in question were enacted for the protection of the defendant. The legislative purpose, as interpreted by the Court of Appeals, was diametrically to the contrary:

"Moon sees the sections here before the Court as having been enacted for the protection of an accused. We see them as concerned with the protection of the public."

In *State v. Werkheiser,* 299 Md. 529, 474 A.2d 898 (1984), Judge Couch referred repeatedly to the unequivocal purpose behind § 16–205.1 of the Transportation Article: "The Maryland General Assembly has enacted laws to enhance the ability of prosecutors to deal effectively with the problem of drunken drivers on our highways." 299 Md. at 533, 474 A.2d 898. "The statutory scheme ... illustrates that the particular section at issue here, § 16–205.1(d), was enacted ... to permit a chemical blood test in the absence of actual consent, where the officer had a reasonable basis to suspect the driver was intoxicated or under the influence of alcohol. Stated simply—this section 'implies' the necessary consent." 299 Md. at 535, 474 A.2d 898. "The legislature has evidenced a strong interest in providing prosecutors with scientific evidence of blood alcohol levels." 299 Md. at 536, 474 A.2d 898. "[T]he general intent of the applicable legislation is for the protection of the public...." 299 Md. at 537, 474 A.2d 898. "In our view it would do violence to

the intent of these statutes to read Transp. Art. § 16–205.-1(d)(1)(iii), in isolation and to construe it in a way that would thwart successful prosecution of motorists. It would frustrate the clear legislative intent to provide the state 'with an easily administered, reliable method of proving intoxication'.... The consent statute and the presumptions a factfinder can draw from the amount of alcohol in the person's breath or blood ... clearly reflect an intent to aid in the factfinding process." 299 Md. at 539, 474 A.2d 898.

With this philosophical imperative firmly in mind, we turn to the case at hand.

The appellant, Victor Chandler Brice, was convicted in the Circuit Court for Somerset County by Judge Alfred T. Truitt, Jr., sitting without a jury, of driving while impaired. He was fined $300 and ordered to pay court costs. Upon this appeal, he mounts four contentions:

1) That under the guidelines of *Schmerber v. California* read in conjunction with § 16–205.1(d) of the Transportation Article, the taking of blood from him, in his seriously injured condition, was so "shocking to the conscience" as to be a violation of due process of law;

2) That the State was erroneously relieved of its burden of proving that any medication administered did not adversely affect the blood alcohol reading and that the court erroneously allocated to the appellant the burden of proving such adverse impact;

3) That the appellant was not competent to consent to the blood alcohol test; and

4) That the results of the test should not have been admitted because the "Two Hour" Rule was violated.

The case against the appellant was overwhelming. The appellant, a sixty-year-old man, had been employed for 22 years by the Delmarva Power and Light Company. On December 5, 1985, he drove his employer's large "cherry-picker truck" in the course of employment as a "trouble-shooter." He began work at 8:00 a.m. and drove the truck, making service calls, all day until the accident occurred at

4:00 p.m. The appellant acknowledged having consumed four ounces of liquor before going to work that morning.

Another driver, travelling behind the appellant on Route 667, observed the appellant weave to the right side of the road initially and then swerve suddenly to the left, crossing the road completely, going into a ditch and overturning his vehicle in an adjacent field. When Maryland State Trooper Robert Lankford arrived at the scene at 4:05 p.m., he observed the overturned truck in a field and observed the appellant walking in the roadway. The appellant was limping and complaining of pain. Trooper Lankford smelled an "extremely strong odor of alcoholic beverage" upon the appellant's breath. The trooper also noticed that the appellant's eyes were bloodshot and his speech was slurred. The appellant initially told the trooper that the accident had been caused by three deer that had darted in front of his truck. He subsequently changed his story and said that a small car had run him off the road just before the deer ran out in front of him. Trooper Lankford gave the appellant a preliminary breath test and determined that he was a suspect for driving while intoxicated.

On cross-examination, the appellant acknowledged that he had been told that he had gone through "withdrawal" in the hospital. He acknowledged that he had not worked since the accident but had spent 30 days at a treatment center for alcoholism and had attended 154 meetings of Alcoholics Anonymous.

The test results on the appellant's blood showed a blood alcohol content of 0.24 per cent. In that the blood was withdrawn approximately two hours after the accident, the blood alcohol level had inevitably been even higher at the time of the accident. Even at the lower figure of 0.24 per cent, it was almost twice the amount necessary under Md.Cts. & Jud.Proc.Code Ann. § 10–307(e) (0.13 per cent) to give rise to the *prima facie* inference that the appellant was intoxicated. Under all of the circumstances, he received quite a break to have been found guilty only of

driving while impaired under § 21–902(b) of the Transportation Article.

## A New Schmerber Exception

The appellant weaves a web of plausible chagrin out of diverse strands. He begins with the Supreme Court decision of *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), in which the Supreme Court found the nonconsensual taking of blood to have been constitutional under the facts of that case. The Supreme Court rejected the idea that the extraction of blood violated the Due Process Clause of the Fourteenth Amendment, citing *Breithaupt v. Abram*, 352 U.S. 432, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957). It rejected the notion that the extraction of blood violated the Fifth Amendment privilege against compelled self-incrimination, reasoning that the privilege dealt only with testimonial evidence. It rejected the notion that the extraction of blood violated the Sixth Amendment right to the assistance of counsel, because counsel could do no more than inform him that he had no right to resist the extraction. Most significantly, the Supreme Court rejected the notion that the extraction offended the Fourth Amendment. The heart of the holding was that no warrant is required because of the "highly evanescent" nature of the evidence itself. In discussing the Fourth Amendment issue, the Court observed that the extraction of blood for a blood alcohol analysis is reasonable because it is "a highly effective means of determining the degree to which a person is under the influence of alcohol," 384 U.S. at 771, 86 S.Ct. at 1836, and noting that such "tests are a commonplace in these days of periodic physical examinations." *Id.* In describing further why the extraction in the *Schmerber* case itself did not violate Fourth Amendment principles of reasonableness, the Court made the following observation, upon which the appellant here heavily relies:

"Finally, the record shows that the test was performed in a reasonable manner. Petitioner's blood was taken by

a physician in a hospital environment according to accepted medical practices. We are thus not presented with the serious questions which would arise if a search involving use of medical technique, even of the most rudimentary sort, were made by other than medical personnel or in other than a medical environment—for example, if it were administered by police in the privacy of the stationhouse. To tolerate searches under these conditions might be to invite an unjustified element of personal risk of infection and pain."

384 U.S. at 771–772, 86 S.Ct. at 1836–1837. Building upon that reasoning from *Schmerber*, we struck down the extraction of blood from a suspect in *Robinson v. State*, 18 Md.App. 678, 308 A.2d 734 (1973). Before us in *Robinson* was the type of circumstance directly condemned by the Supreme Court. Taking the blood from the suspect in the *Robinson* case was not a physician or other medical personnel but Corporal Summers of the Prince George's County Police Department. Judge Gilbert (now Chief Judge) pointed out for us, at 18 Md.App. 694, 308 A.2d 734:

> "It appears on the record before us that Summers, unassisted by a physician or other medical personnel, removed the blood from the appellant. There was no testimony as to any qualification possessed by Summers to withdraw blood from the body of another. There is nothing that would indicate that the blood was withdrawn in the 'hospital environment' suggested by *Schmerber*. A clear inference may be drawn from the testimony to the effect that appellant's blood sample was taken while he was in the county detention center."

The situation at hand does not remotely approach that discussed in *Schmerber* or dealt with in *Robinson*. Here, the blood was drawn by a nurse and in a hospital. Since a qualified nurse withdrew the blood under appropriately antiseptic conditions, there was obviously not the threat that might be posed by a medically untrained policeman operating in a stationhouse of "personal risk of infection and pain."

■ The appellant recognizes that his situation is not on all fours with the holding of *Robinson* or the *dicta* of *Schmerber.* He seeks rather to spell out a new set of circumstances wherein the taking of blood may be unreasonable. Section 16–205.1(d) of the Transportation Article provides that where an officer reasonably suspects drunken driving and where the suspect is incapable of refusing consent, the officer may direct a qualified medical person to withdraw blood for a chemical test "[i]f a chemical test for alcohol would not jeopardize the health or well-being of the individual." It is the appellant's argument that his health and well-being were jeopardized in this case. He points out that he was in the hospital with nine broken ribs, a punctured lung, and a dislocated right shoulder. He points out that he had been given medication and was, in the judgment of his wife, incapable of giving valid consent to a blood test even though he was conscious and apparently coherent. Although the appellate argument cites evidence that the appellant was in shock and that his blood pressure was dropping, that evidence came only from the appellant's wife, who is neither a physician nor a nurse. Even though the trooper's direction to take the blood was to the nurse, in the momentary absence of the attending physician, we see nothing in these circumstances that offends either *Schmerber* or *Robinson.*

■ Indeed, the decision of *State v. Werkheiser,* 299 Md. 529, 474 A.2d 898 (1984), goes strongly against the appellant's argument here. In that case, the defendant had been transported from the accident scene to a hospital in Easton. He was being treated for a gash in his head. It was stipulated in that case that the defendant was " 'unconscious or otherwise incapable of refusing to take a chemical test.' " *Id.* at 532, 474 A.2d 898. In that case, the trooper did not direct a qualified medical person to withdraw blood for a chemical test. The trial judge ruled that Md.Transp. Code Ann. § 16.205.1(d) is mandatory and that the police officer was under a legal obligation to order that the test be made. The Court of Appeals agreed with the trial court in

that regard and held that "this statute imposes a mandatory duty upon police officers." *Id.* at 533, 474 A.2d 898. The officer in this case did what the statute and *State v. Werkheiser* indicate he was obligated to do. Under the circumstances, we cannot agree with the appellant that "the conduct of the trooper was repugnant to generally accepted standards of fair behavior, even police behavior." The appellant's case in this regard reduces itself to little more than innuendo. He does not claim to have been in a life-threatening situation; he simply makes the *ad hominem* argument that "so far as the trooper knew, this might well have been a life-threatening situation." With no support in the evidence, the appellant goes on to insinuate, "The trooper apparently believed nevertheless that it was his duty to use any means in order to make (or fake?) a case against the appellant." As the case law discussed earlier makes clear, Society imposes upon the trooper the obligation to move with all possible diligence against drunken drivers. The appellant's final insinuation goes only to the credibility of the trooper and is, therefore, beyond our concern: "That he endeavored to prosecute at all in the context of this case casts suspicion upon all such reported timings and on the animus of the trooper." The blood alcohol content of 0.24 per cent indicates that the trooper did precisely what Society expects him to do.

### *Allocation of Burden of Proof As To Possible Influence of Medication On Blood Alcohol Test Results*

The appellant's second contention is one of first impression. It is conceded that the appellant consumed no alcoholic beverages between the time of the accident and the time his blood was withdrawn for a blood alcohol content analysis. His blood alcohol content was 0.24 per cent. It is the appellant's claim that medication possibly administered to him by ambulance personnel or hospital personnel may have contained alcohol and may, therefore, have been the causative factor for the high blood alcohol content.

The appellant offered no evidence that any medication was administered that contained alcohol. The State offered no evidence that no medication was administered that contained alcohol. As to this issue (or non-issue), the judge was presented with the classic nothing-to-nothing tie. It is the pure evidentiary problem of the allocation of the burden of proof. The party to whom that burden is allocated, by definition, is the loser of a tie.

In Md.Cts. & Jud.Proc.Code Ann. §§ 10–306 and 10–307, the Legislature has provided that the results of a blood test for blood alcohol content are admissible in the courts of this state. In terms of antecedent requirements, it has decided that such tests "shall be conducted by a qualified person using equipment approved by the toxicologist under the Postmortem Examiners Commission in a laboratory approved by that toxicologist" and further that the blood sample "shall be obtained by a qualified medical person using equipment approved by the toxicologist." Md.Cts. & Jud.Proc.Code Ann. § 10–304(c). There is no claim in this case that those procedural steps were not taken. Once blood is withdrawn by a qualified medical person and a test is conducted with properly approved equipment, the law states flatly that the test results are admissible. The blood alcohol content of 0.24 per cent in this case engaged the gears of § 10–307(e), which provides, without any further conditions:

"If at the time of testing there was in the person's blood 0.13 percent or more by weight of alcohol, as determined by an analysis of the person's blood or breath, it shall be prima facie evidence that the defendant was intoxicated."

The legislative scheme is clear. As long as the legislatively mandated preconditions have been satisfied, the test results 1) are admissible generally and 2) will trigger, depending upon the quantitative reading, the appropriate legal effect spelled out by § 10–307(b) through (e). In this case, the test result showing a blood alcohol content of 0.24 per cent 1) was admissible and 2) established a *prima facie* case that the appellant was intoxicated. To the

extent to which the appellant wanted to offer defensive evidence, by way of impeaching the credibility of the test result or diminishing its weight, the appellant was free to do so when he presented his defense. A defendant seeking to rebut evidence of apparent intoxication by showing that he was on prescribed medication would, of course, have the burden of coming forward with such evidence. It would be an absurdity to require the State to disprove such possibilities as a precondition for offering the test result. By the same token, there was no impediment here to the appellant's examining the medical records of treatment administered and medication prescribed, of interviewing and/or summonsing the medical personnel to explore any possibility of medication affecting the test results, or of calling medical experts generally as to the possible alcohol content of the specific medicines involved. We have no doubt that had there been such evidence in this case, the highly competent defense counsel involved would have found it. All such factors, however, even when produced by the party having the burden of production, go only to weight and not to admissibility.

A doctrinally similar challenge was before us in *Casper v. State*, 70 Md.App. 576, 521 A.2d 1281 (1987), in which an appellant challenged the admissibility of a chemical test of breath used to determine blood alcohol content. The appellant there charged that the State had not, as a precondition for admissibility, proved that the ampules used were fresh enough to produce an accurate result. In holding that the burden was upon the defendant to impeach the presumptive reliability of a test result that satisfied the legislatively established requirements, Judge Alpert stated for this Court, at 70 Md.App. 583, 521 A.2d 1281:

"Test results produced by a qualified person using certified equipment in a timely manner are *prima facie* reliable. *See Moon v. State*, 300 Md. 354, 370, 478 A.2d 695 (1984)."

In pointing out 1) that the burden was on the defendant to challenge reliability and 2) that the challenge, in any event,

would go only to weight and not to admissibility, we held, at 70 Md.App. 586, 521 A.2d 1281:

"Casper was free to challenge that reliability with evidence tending to show that the ampules had changed since being certified. Md.Cts. & Jud.Proc.Code Ann. § 10–304(f) (1984). The fact that his ampules were 9 months old, without more, however, went to the weight, not to the admissibility of Casper's test results. Consequently, the State was not required to offer further proof of the chemical accuracy of these ampules."

There was no burden upon the State to negate the speculative possibility that the medication given the appellant in this case adversely affected the test result. The judge's ruling was correct.

### Competence: Competence to Do What?

At the hospital, prior to directing the nurse to take a sample of the appellant's blood, Trooper Lankford advised the appellant of his right to refuse to submit to a chemical test for intoxication. Trooper Lankford testified that the appellant was coherent and appeared to understand fully what was happening. The appellant signed an "Advice of Rights" form, according to which he agreed to submit to the chemical test for intoxication. At trial, the appellant denied all memory of the transaction. The appellant's wife testified that she objected to the drawing of blood because of her husband's condition. She testified further that in her opinion her husband was incapable of refusing the test. The appellant's contention is that he was not competent to consent to the test. Our holding to the contrary rests upon either of two alternative predicates.

■ Factually, Judge Truitt found that the appellant did agree to submit to the test. The testimony of Trooper Lankford supported that finding by Judge Truitt. We cannot say that the judge was clearly erroneous in making that factual determination.

■ Equally foreclosing to the appellant's argument is the fact that legally he was in a "Catch 22" situation. It is not required that he validly submit to a chemical test for intoxication. By virtue of Maryland's "Implied Consent Law," Md.Transp.Code Ann. § 16.205.1(a), any driver of a motor vehicle on the highways of this state "is deemed to have consented" to take a chemical test to determine alcohol content of his blood. The option that is given is, under appropriate circumstances, that of refusing to take the test. One must be conscious and competent to execute a valid refusal. Where a driver is absolutely incompetent to refuse or where his competence is questionable, the provisions of Md.Cts. & Jud.Proc.Code Ann. § 10–305(b) take over:

"Any person who is dead, unconscious, or otherwise in a condition rendering him incapable of test refusal shall be deemed not to have withdrawn consent."

The competence of the appellant here is subject to Talmudic analysis. At the time just before Trooper Lankford directed the nurse to draw the blood, the appellant either was competent or was incompetent. If competent, the waiver form he signed was binding upon him and he validly consented to the chemical test. If incompetent, § 10–305(b) directs that one "in a condition rendering him incapable of test refusal shall be deemed not to have withdrawn consent." The consent that was implied as a matter of law when the appellant obtained his driver's license and/or ventured forth upon the highways of this state remained fully operational. *State v. Moon*, 291 Md. 463, 477, 436 A.2d 420 (1981). By every possible avenue of logic, the validity of subjecting the appellant to the blood test for blood alcohol content will be sustained.

### The Significance of the "Two-Hour Rule"

The appellant relies heavily on § 10–303 of the Courts and Judicial Proceedings Article, which provides that the "specimen of breath or blood shall be taken within two hours after the person accused is apprehended." The blood sample was taken at the Easton Hospital at 6:05 p.m. The

appellant argues that this was two hours or more after Trooper Lankford first saw the appellant "around 4:00 to 4:05 p.m." The appellant's argument is that Trooper Lankford immediately detected a strong odor of alcohol on the appellant's breath and had probable cause to arrest him for driving while intoxicated. Indeed, a "preliminary breath test" administered at the scene gave the trooper strong reason to believe that the appellant was intoxicated. The appellant argues that he was, *de facto*, under arrest as of that time and that the ultimate drawing of blood failed by a minute or so to make it under the wire of the two-hour time limit.

This argument is made notwithstanding the unequivocal finding by Judge Truitt that the arrest occurred and the two-hour clock began to run at 4:16 p.m., in which case the taking of the blood was accomplished with 11 minutes to spare. Absolutely fatal to the appellant's argument is the holding of the Court of Appeals in *Willis v. State,* 302 Md. 363, 488 A.2d 171 (1985). In that case, the blood sample in question was taken at 4:50 a.m., making the critical time for "apprehension" not earlier than 2:50 a.m. The argument of Willis there about *de facto* apprehension was far stronger than the argument of the appellant here. In that case, an officer observed Willis "confused and disoriented" as early as 1:18 a.m. The officer detected the odor of alcohol on Willis's breath, learned that Willis had been at a bar consuming drinks, and ultimately took Willis's driver's license as early as 1:18 a.m. At 2:00 a.m., an officer looked in on Willis in an ambulance to check on her. The officer indicated that "he would have detained her for the purpose of completing his investigation had she attempted to leave." 302 Md. at 367, 488 A.2d 171. The Court of Appeals upheld the ruling of the suppression hearing judge that the literal apprehension did not occur until 3:00 a.m., when medical treatment was completed and after one of the officers advised Willis of her rights. *Id.* at 369, 488 A.2d 171. The Court of Appeals explicitly rejected Willis's argument "that an accused is 'apprehended' under § 10–303 when a police

officer first becomes aware of the accused's inebriated
condition and decides to restrain the accused, if necessary,
for further investigation." *Id.* at 371, 488 A.2d 171. After
reiterating that § 10–303 was "enacted to discourage per-
sons from drinking and driving, to enable law enforcement
officers to identify those who drink and drive," *id.* at 374,
488 A.2d 171, Judge Cole concluded for the Court:

> "In our view, the subjective intent of the officer, standing
> alone, is not controlling; it is when he acts upon that
> intent that an apprehension occurs."

*Id.* at 377 n. 15, 488 A.2d 171. Judge Cole went on to
explain the eminent good sense of the legislative determina-
tion that the two-hour period should not begin to run until
the officer has had ample time to carry out emergency
medical measures before turning his attention to less ur-
gent, albeit important, investigative measures:

> "Under a more refined and searching inquiry the issue
> narrows as to what point a police officer is considered to
> have 'apprehended' the accused at an automobile accident
> scene. Of course, common sense dictates that upon arriv-
> ing at an accident scene the officer's paramount responsi-
> bility is to render any necessary emergency medical treat-
> ment until trained personnel arrive. Until such a time it
> would be eminently unreasonable for the officer to en-
> gage in a comprehensive accident investigation. In short,
> *the police officer's investigatory responsibilities are
> subordinated to the more pressing responsibility of
> rendering emergency medical treatment and to take
> other steps to secure the safety of both the victims and
> the public, such as directing traffic at the accident
> scene.* Once the appropriate personnel arrive, the officer
> is in most cases relieved of his emergency medical treat-
> ment responsibility and is thus free to engage in an
> investigation if it does not interfere with the treatment of
> the injured or jeopardize the safety or welfare of those
> involved. Hence, police must usually wait until the emer-
> gency subsides and until the necessary medical treatment
> has been rendered before pursuing their criminal investi-

gation. In our view, this objective-based analysis is fully consistent with the legislative intent to preserve the two-hour time limit as an effective requirement and avoids forcing police to choose between ensuring the safety of the accident victims and the prosecution of the accused." (Emphasis supplied).

*Id.* at 378–379, 488 A.2d 171.

The finding of Judge Truitt that the apprehension occurred at 4:16 p.m. 1) was not clearly erroneous as a matter of fact and 2) was correct as a matter of law.

■ Our affirmance of the trial court in this regard could rest equally well on either of two alternative holdings. In the first place, the appellant here argues only about the admissibility of the chemical test result; he is not arguing about the legal significance which Judge Truitt may have given to that test result. Indeed, no issue was raised by the appellant at trial about Judge Truitt's forebearing to give, in his fact-finding capacity, evidentiary significance to the test result. In *State v. Moon, supra,* the Court of Appeals was dealing with a situation where a blood sample had been withdrawn more than two hours after the incident in question. In advancing three separate reasons why the appellant there suffered no prejudice, Judge Smith pointed out that the sanction for a violation of § 10–303 is not an exclusion of the test result as evidence but only the preclusion of an unduly delayed test's triggering the presumptions or permitted inferences established by the statute. He concluded, at 291 Md. 475, 436 A.2d 420: "The third reason [that this delay should not bar the evidence] ... is the time lag would relate not to admissibility of evidence but as to the presumptions arising from the evidence." The appellant's present contention goes only to evidentiary admissibility, not to evidentiary significance.

■ Equally dispositive of the contention in the appellant's disfavor is the fact that a delay in the administration of a blood test works only to the appellant's advantage. Section 10–303, enacted to facilitate the successful prosecu-

tion of drunken drivers, *Willis v. State, supra,* at 302 Md. 374, 488 A.2d 171, imposes the two-hour time limit to prevent the defense from securing an exculpatory bonus from a favorable test result to which it would not be logically and scientifically entitled. Assuming it can be demonstrated that a suspect has not consumed additional alcohol between the criminal incident and the drawing of the blood, the very metabolism of his body will cause the blood alcohol content to diminish steadily with the passage of time. "As time passes the alcohol in the blood disappears as Justice Brennan noted for the Court in *Schmerber.*" *State v. Moon, supra,* 291 Md. at 474, 436 A.2d 420. Thus, a low blood alcohol content revealed by a test conducted hours after the incident would not show that the defendant had not been intoxicated or impaired at the time of the incident. "[A]n analysis ... reflects the amount of alcohol in the blood at the time it was withdrawn, not at the time of the incident." *Id.* at 474, 436 A.2d 420. The clear purpose of the two-hour limitation is to "catch" the alcohol in the blood before it has had the chance to be metabolized. The invalidity of an unduly delayed test for blood alcohol, however, is one-directional.

If, notwithstanding the passage of time and notwithstanding the diminution of blood alcohol content by the metabolic processes of the body, the residual blood alcohol percentage is still high enough to trigger the *prima facie* case of either impairment or intoxication and to give rise to either of the respective permitted inferences, the evidentiary significance cannot be denied. If the blood alcohol content is still above the statutory levels of legal significance hours after the incident, *a fortiori,* the suspect was inferentially impaired or intoxicated even more so at the time of the incident. *Willis v. State, supra,* spoke to this very point, at 302 Md. 380, 488 A.2d 171:

"Willis nonetheless contends that a blood alcohol test administered approximately four hours after the accident is unreliable and for that reason is prejudicial. As the Supreme Court and this Court have observed, it is gener-

ally agreed that a person's blood alcohol content decreases with the passage of time. ... Because any delay in the administration of a chemical test ordinarily inures to the benefit of the accused, an accused suffers no prejudice." (Citations omitted).

*State v. Moon, supra,* also pointed out that, "Moon has in no way been prejudiced by the fact that the sample here was withdrawn more than two hours after the incident in question." 291 Md. at 474, 436 A.2d 420. That decision reasoned, at 291 Md. 475, 436 A.2d 420:

"Thus, a report as to the alcohol content of Moon's blood at a time more than two hours after the incident would not be less favorable to Moon than a report as to the alcohol content at a time within the two hour period."

In summation, the blood for the chemical test was withdrawn within two hours after the apprehension of the appellant. Even if there had been a violation of the two-hour rule, exclusion of the evidence would not be called for. Even if there had been a violation of the two-hour rule, the results of a delayed test would not have worked to the prejudice of the appellant but only to his advantage.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.